VESTRON, INC., Plaintiff,

v.

NATIONAL GEOGRAPHIC
SOCIETY, Defendant.

No. 90 Civ. 1507 (MJL).

United States District Court,
S.D. New York.

May 25, 1990.

Bruce E. Fader, Steven M. Kayman, Anita J. Zigman, Michael D. Povman, Proskauer Rose Goetz & Mendelsohn, New York City, for plaintiff.

Steven J. Hyman, Paul H. Levinson, Leavy Rosensweig & Hyman, New York City, for defendant.

## MEMORANDUM AND ORDER

JAMES C. FRANCIS IV, United States Magistrate.

The parties to this action have consented to proceed before a United States Magistrate pursuant to 28 U.S.C. § 636(c). Two motions are currently pending: the plaintiff's motion for a preliminary injunction and the defendant's motion to disqualify plaintiff's counsel.[1] For the reasons that follow, the plaintiff's motion is granted and the defendant's motion is denied.

*Background*

Vestron, Inc. ("Vestron"), the plaintiff in this action, produces and distributes video programs. In 1985, the National Geographic Society ("the Society") granted Vestron an exclusive license for domestic home video rights for the Society's well known television documentaries. (Pl. exh. 4). Pursuant to this agreement, the Society provided master tapes from which Vestron produced and duplicated videocassettes for distribution in the United States and English-speaking Canada. In addition, Vestron sold cassettes back to the Society at $13.75 per unit, and the Society then resold these to its members through a video club solicitation.

In 1987, the Society began exploring the possibility of distributing videocassettes of its programs in certain foreign territories. A number of potential distributors, including Vestron, submitted proposals. Vestron's bid included not only plans for foreign distribution, but also the offer of a concession on its domestic contract with the Society, lowering the price from $13.75

---

1. The defendant originally moved to dismiss the complaint on the basis of a forum selection clause in the contract at issue, but it withdrew this motion at the conclusion of the preliminary injunction hearing.

to $10.00 for each cassette sold back to the Society.

Vestron's proposal dated December 8, 1987, stated that "Vestron distributes and sells directly to the video trade in every major international video market with its own sales force. Local offices are in full operation in: London, England; Stockholm, Sweden; Brussels, Belgium; Munich, West Germany; Utrecht, Netherlands; Tokyo, Japan; Sydney, Australia; Paris, France." (Pl. exh. 14, Proposal at 3).

In recommending acceptance of Vestron's bid, Tim Kelly, the Society's associate director for television, stated:

Vestron has submitted a revised bid for home video distribution in certain foreign territories (primarily Western Europe and Australia). The bid is a good one, combining price concessions which lower the Society's cost for obtaining videos for the National Geographic Video Club, with a strong proposal for distribution in the foreign territories.

(Pl. exh. 1). The analysis upon which Mr. Kelly relied found that Vestron's bid was economically preferable to the next best offer because of the price concession on the domestic agreement. (Id.). Mr. Kelly also argued that "Vestron has a full service international distribution operation based in London, with 7 other offices, and staffed by approximately 170 people worldwide." (Id.).

The Society ultimately accepted Vestron's bid, and by a Memorandum of Agreement dated July 22, 1988, Vestron received the rights to sixty titles, to be released over a period of six years. (Pl. exh. 2). The territories covered were France and certain French-speaking territories, non-Italian speaking Switzerland, Austria, East and West Germany, Liechtenstein, the Benelux countries, Australia and New Zealand, Scandinavia, Spain, Portugal, and Greece. (Id.). The Society was guaranteed $1,000,000, to be paid in annual installments of $200,000, and it was entitled to royalties of seventeen percent of gross receipts. (Id.). On the domestic side, Vestron agreed to lower the price that it charged for videotapes purchased by the Society itself to $10.00, and the term of the domestic agreement was extended for a year. (Id.).

Following execution of the Memorandum of Agreement, the parties performed under the modified terms of the domestic arrangement, with Vestron providing finished cassettes to the Society at the lower price. (Tr. 64–65, 234).[2] However, the Memorandum of Agreement specifically contemplated the drafting of a more formal document reflecting the agreed upon terms. (Pl. exh. 2).

Prior to execution of the long-form contract, the parties had additional communications about the plans for foreign distribution. First, in a meeting in Vestron's offices in Stamford, Connecticut in September, 1988, Vestron described how the European operation would be coordinated by Locus Video Group, B.V. ("Locus"), its affiliate in Utrecht. (Tr. 107–08). Next, a meeting was set for May 3, 1989, both to prepare for signing of the long-form contract and to allay the Society's concerns about Vestron's financial health. (Tr. 110). In preparation for this meeting, Vestron developed a document entitled "Home Video Launch Plan" that described its plans for initiating distribution. This document included details of a "hub" arrangement, with each of seven market territories coordinated from a different hub office. (Pl. exh. 15 at 2, 4–5). In the first draft of this document presented to the Society, the Scandinavian hub was located in Stockholm (Def. exh. D. at 4), while in the revised version, this territory was to be coordinated from a London office. (Pl. exh. 15 at 4). In both drafts, the territories of Spain, Portugal, and Greece were to be subject to oversight from Vestron's Los Angeles office. (Id. at 5; Def. exh. D at 6). At the May 3 meeting, it was projected that the Society's first foreign distribution would be undertaken simultaneously in each territo-

---

**2.** Tr. refers to the transcript of the preliminary injunction hearing held on April 16 and 17, 1990. The transcript of the continued hearing on April 19 is separately paginated and will be designated Tr.*.

ry in September, 1989 and would be coordinated from Locus in Utrecht. (Tr. 118–22). In addition, Jon Peisinger, Vestron's President, acknowledged that Vestron was seeking additional financing, but assured the Society that it would be forthcoming. (Tr. 122–23).

On May 10, 1989, the deal anticipated by the Memorandum of Agreement was finally formalized. The domestic agreement was officially modified to incorporate the extended term and price changes. (Pl. exh. 4). At the same time, a full contract for foreign distribution rights was executed by the Society and by Vestron Video International, a division of Locus. (Pl. exh. 3).

In addition to the terms set forth in the Memorandum of Agreement, this long-form contract also included several clauses of significance to this litigation. First, Vestron warranted that it would use:

best efforts to promote the manufacture, sale, distribution, and exploitation of the Programs to create and satisfy demand in the Territory and that it will use best efforts to make and maintain adequate arrangements for the sale, distribution, and exploitation of the Programs in all available markets permitted hereunder throughout the Territory.

(*Id.* at Principal Terms, ¶ 16). Next, the long-form contract provides that "[n]othing herein contained shall be deemed to limit [Vestron] from entering into any agreement with any subdistributor, wholesaler, retailer or otherwise with respect to copies on whatever term and conditions [Vestron] and such other party may agree." (*Id.* at General Terms, ¶ 5(j)). Finally, the Society is barred from rescission or equitable relief and is relegated to an action for damages except where Vestron fails to make a guarantee or royalty payment or fails to render a royalty statement. (*Id.* at General Terms, ¶ 9).

Following execution of the long-form contract, Mr. Berman of the Society met with representatives of the Vestron hubs at Locus' offices in Utrecht. (Tr. 123). Although Mr. Berman was apparently unaware of it at the time, the representative of the French hub was in fact an employee of Warner Home Video, to whom Vestron had sublicensed its French rights. (Tr. 123–29, d238, 377–78; Pl. exh. 34).

Throughout the period of the negotiations and implementation of the foreign licensing agreement, Vestron was experiencing financial uncertainty. On August 10, 1988, Vestron had received from Security Pacific National Bank a commitment for a $100 million credit facility. However, this commitment was withdrawn in October, 1988. (Tr. 191–92). Thereafter, Vestron obtained $40 million in short term financing and made efforts to find a longer term credit facility. In April, 1989, it succeeded in obtaining a commitment for a $50 million facility from Chemical Bank, contingent on Chemical's ability to syndicate $30 million of the loan. (Tr. 194–96).

By mid-June, 1988, it was evident that Chemical would not be successful, and its commitment would be withdrawn. Consequently, Vestron decided to close Vestron Pictures, its movie production unit. Since Vestron Pictures had supplied Vestron's foreign distributors with a large share of their inventory, Vestron decided in July, 1989 to close its remaining direct sales offices in Benelux, Germany, and Australia, and rely exclusively on subdistributors. (Tr. 198–99). In late July, 1989, Jon Peisinger of Vestron communicated these changes to Tim Kelly of the Society in a telephone conversation. (Tr. 273). Thereafter, he discussed them again with Todd Berman during a convention that they both attended on August 8–10, 1989. (Tr. 275–77). Finally, in a memorandum dated August 11, 1989, Eric Eggleton of Vestron advised Todd Berman of the details of the restructured foreign operations and indicated that the launch date would likely be pushed back from September to October. (Pl. exh. 21). Nevertheless, a schedule was developed that called for an initial release of six titles, followed by releases of three titles each in December, 1989 and March, June, September, and December of 1990 (*Id.;* Tr. 132–34; Tr.* 95–96).

Some difficulties in distribution then ensued. The launch of the Society's videocassettes was not accomplished simultaneous-

ly in all territories as originally planned. (Tr. 261). Indeed, in Australia, Benelux, and Norway, the first videotapes have yet to be placed in the market. (Tr. 366–72). There were also problems with production, including delays in translation and miscommunications concerning packaging. (Tr. 262–64; Tr.* 90–95).

Perhaps most significant to the Society, Vestron's reliance on subdistributors threatened to reduce the royalties that the Society would ultimately receive. As long as Vestron distributed directly, the Society would receive seventeen percent of the gross receipts received by Vestron. However, by sublicensing the rights, Vestron reduced its own gross receipts by about eighty percent, thus proportionally reducing the amounts to be passed through to the Society. (Tr. 391–94).

On December 6, 1989, the Society's counsel sent a letter to Vestron objecting to the restructuring of the foreign operations and complaining of a number of problems encountered under the domestic agreement. The attorney's letter concluded as follows:

> As a result of the foregoing we have been instructed by the Society to advise you of the matters set forth above and to insure that you understand the seriousness with which our client views the situation. We are advised that a meeting with the Society is now scheduled for December 19, 1989 and it is our client's hope that these matters can be amicably resolved at that time. However, if not, the Society has informed us that it will have to consider its other rights and remedies.

(Pl. exh. 11).

The parties did meet on December 19. At that time Tim Kelly first proposed that Vestron agree to terminate both the domestic and international agreements. When Jon Peisinger declined, Mr. Kelly then suggested that Vestron lower the rate that it charged to the Society for its purchase of videocassettes from $10 to $6 or $7.

Again, Mr. Peisinger refused, and no resolution was reached. (Tr. 284–90).

The Society then ceased performing under the international agreement by refusing to deliver additional master tapes. (Tr. 82; Tr.* 175–76). The schedule called for the Society to supply by December, 1989, all masters due for release during 1990. (Pl. exh. 21). By late August, it had delivered tapes for releases through April, 1990,[3] but one of the April releases—"African Wildlife"—was returned as being of unacceptable quality. (Tr.* 99; Pl. exh. 23). The Society has declined to provide a replacement or to supply masters for subsequent releases. (Tr.* 175–76).

The plaintiffs then initiated the instant action, and sought preliminary relief enjoining the Society from selling any rights for the territories covered by the agreement and requiring the Society to supply the masters for releases through the end of 1990. The Society argues that any breach that it has committed is compensable in damages and that Vestron is therefore not threatened with irreparable harm. The Society further contends that Vestron has no likelihood of success on the merits because it fraudulently induced the Society to enter into a contract and then breached the agreement by, among other things, entering into sublicensing agreements and failing to use its best efforts.

*Discussion*

I. Preliminary Injunction Motion

In order to prevail on its preliminary injunction motion, Vestron must demonstrate "(a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits as to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting preliminary relief." *Roso–Lino Beverage Distributors, Inc. v. Coca–Cola Bottling Co.*, 749 F.2d 124, 125 (2d Cir.1984) (quoting *Jackson Dairy, Inc. v. H.P. Hood & Sons*, 596 F.2d 70, 72 (2d Cir.1979).

---

**3.** According to the original schedule, this was to have been a March, 1989 release, but it was pushed back one month.

■ The Society argues, however, that a higher standard must be applied here because Vestron seeks a mandatory rather than a prohibitory injunction. Indeed, where a party seeks an injunction that would alter the status quo and grant it substantially all the relief ultimately requested, the movant must demonstrate a substantial likelihood of success on the merits. *See Johnson v. Kay*, 860 F.2d 529, 540 (2d Cir.1988); *Abdul Wali v. Coughlin*, 754 F.2d 1015, 1025–26 (2d Cir.1985). But here the status quo is most properly seen as continuous performance under the contract; indeed, the contract says as much by requiring performance pending the resolution of most disputes. (Pl. exh. 3 at General Terms, ¶ 9). Furthermore, the injunction sought by Vestron would have no impact on the parties' obligations beyond 1990, and so it hardly grants the plaintiff all the relief sought. *See Johnson v. Kay*, 860 F.2d at 541. Accordingly, the usual preliminary injunction standards are applicable here.

A. *Irreparable Harm*

■ "[T]erminating the delivery of a unique product to a distributor whose customers expect and rely on the distributor for a continuous supply of the product almost inevitably creates irreparable damage to the good will of the distributor." *Reuters Ltd. v. United Press International, Inc.*, 903 F.2d 904, 907–908 (2d Cir.1990) (citing, *inter alia, Jacobson & Co. v. Armstrong Cork Co.*, 548 F.2d 438, 444–45 (2d Cir.1977)). *See also Travellers International AG v. Trans World Airlines, Inc.*, 684 F.Supp. 1206, 1216 (S.D.N.Y.1988) (loss of product line results in irremediable loss of good will). Thus, "in cases where a preliminary injunction has issued to prevent a product source from suspending delivery to a distributor, the irreparable harm has often consisted of the loss of customers and the competitive disadvantage that resulted from a distributor's inability to supply its customers with the terminated product." *Reuters*, at 909.

This is such a case. Vestron is committed to its subdistributors to supply them with the Society's documentaries along with a variety of other titles. Failure to do so will result in litigation with the subdistributors, incalculable loss of revenues on other titles if their distribution is affected, and diminution of good will. And, of course, such consequences are all the more incalculable because they will occur down through the chain of distribution to the retailers and ultimate consumers. In short, there would be a chain reaction of losses, impossible to quantify both at any specific stage and in total.

Indeed, even if problems of good will, commitments to subdistributors, and the like were not present, damages could still not be readily calculated. First, Vestron's distribution of the Society's program was cut off almost at its inception, thus making it impossible to project future sales on the basis of any track record. Second, Vestron and the Society had agreed to a schedule of releases designed to create sales momentum. Once that momentum is disrupted, it affects subsequent sales to an indeterminate extent. In such circumstances, Vestron is faced with irreparable injury because of the uncertainty of monetary damages. *See Danielson v. Local 275, Laborers International Union*, 479 F.2d 1033, 1037 (2d Cir.1973); *Gulf & Western Corp. v. Craftique Productions, Inc.*, 523 F.Supp. 603, 607–09 (S.D.N.Y.1981).

B. *Likelihood of Success of the Merits*

The Society concedes its obligation to deliver master tapes to Vestron under the contract. Therefore, probability of success on the merits turns on whether the Society will be able to sustain any of its claims of wrongdoing by Vestron.

1. Fraud in the Inducement

■ The Society first seeks to be relieved of its obligations on the ground that it was fraudulently induced by Vestron to enter into the contract. It argues that Vestron falsely represented its financial ability and its intent to conduct the foreign distribution with a direct sales force operating from a series of territorial hubs.

Under New York law, the Society must establish five elements to prove fraud: mis-

representation of a material fact, falsity of that representation, scienter, reliance, and damages. *See Mallis v. Bankers Trust Co.*, 615 F.2d 68, 80 (2d Cir.1980), *cert. denied*, 449 U.S. 1123, 101 S.Ct. 938, 67 L.Ed.2d 109 (1981). Moreover, the Society must prove its claim of fraud by clear and convincing evidence, a burden " 'far more demanding' than that for breach of contract." *Ajax Hardware Manufacturing Corp. v. Industrial Plants Corp.*, 569 F.2d 181, 186 (2d Cir.1977) (quoting *JoAnn Homes at Bellmore, Inc. v. Dworetz*, 25 N.Y.2d 112, 302 N.Y.S.2d 799, 250 N.E.2d 214 (1969)).

Here, there is a substantial likelihood that Vestron will rebut the Society's charges of fraud. There is no doubt that Vestron represented that it would engage in foreign distribution through a series of hub offices. However, there is also no evidence that Vestron employees had any doubts about these representations at the time they were made. Moreover, by the time the long-form contract was signed, the Society knew that there was no local office serving Spain, Portugal and Greece, and, on the basis of Vestron's "Launch Plan," it should have known that the same was true of Scandinavia. These facts cut against any assertion that the Society relied on Vestron's initial representations. Indeed any claim of reliance is dealt a fatal blow by the long-form contract itself. The Society can hardly maintain that Vestron's direct sales force and hub offices were critical to its assent when, by the very contract that the Society drafted, Vestron is explicitly permitted to enter into subdistribution agreements. *See Danann Realty Corp. v. Harris*, 5 N.Y.2d 317, 320–22, 184 N.Y.S.2d 599, 601–03, 157 N.E.2d 597 (1959).

Similarly, no significant evidence has been presented that Vestron's representations about its financial health were fraudulent. The Society occasionally asked vague questions about Vestron's capacity to perform the contract and received equally vague answers. (Tr. 110, 122–23).

These were not specific misrepresentations that could have been reasonably relied upon. *See The Sample Inc. v. Pendleton Woolen Mills, Inc.*, 704 F.Supp. 498, 505 (S.D.N.Y.1989).

### 2. Insolvency

■ The Society next argues that it is entitled to terminate the contract because Vestron is insolvent. Indeed, pursuant to the terms of the contract, insolvency is one of the grounds for termination without prior notice to Vestron.[4] However, whether Vestron is "insolvent" depends upon the definition of that term for purposes of the contract:

> The equity test of insolvency equates insolvency with a lack of liquid funds, or the inability to pay one's debts in the ordinary course of business as the debts mature.... The bankruptcy test of insolvency, on the other hand, focuses on the balance sheet of a company at discreet intervals of time in order to determine whether the company's liabilities exceed its assets.

*Kreps v. C.I.R.*, 351 F.2d 1, 9 (2d Cir.1965). *See also In re Anjopa Paper & Board Mfg. Co.*, 269 F.Supp. 241, 263 (S.D.N.Y. 1967) (insolvency means debtor unable to meet obligations as they fall due); *Estate of Froehlich*, 98 Misc.2d 1, 2, 416 N.Y.S.2d 744, 745 (Sur.Ct. Nassau Co.1979) ("Insolvency, in essence, is an inability to pay debts as they become due.").

If, in the instant case, insolvency is defined as liabilities exceeding assets, then the Society is likely to prevail, since Vestron's balance sheet shows a negative net worth. (Tr. 350). On the other hand, if insolvency is equated with the inability to meet debts as they come due, then Vestron is likely to prevail, since it has not failed to meet its debt obligations. (Tr. 207–08).

Since the use of the word "insolvency" here is not derived from any statute, it is necessary to look to the intent of the parties to determine its significance in the contract. *See Meighan v. Finn*, 146 F.2d

---

**4.** Termination is permitted if Vestron "files a petition in bankruptcy, is adjudicated a bankrupt, becomes insolvent, makes an assignment for the benefit of creditors, or if a receiver, liquidator, or trustee is appointed for its business or assets, or if [Vestron] otherwise takes advantage of any insolvency law. (Pl. exh. 3 at Principal Terms, ¶ 17).

594, 595 (2d Cir.1944), *aff'd,* 325 U.S. 300, 303, 65 S.Ct. 1147, 1149, 89 L.Ed. 1624 (1945) (insolvency found to mean inability to meet debts in context of contract). The primary concern of the Society in providing for termination was the threat that it would not be paid. This is evident from the fact that, in addition to insolvency, only failure to pay royalties or provide an accounting are grounds for rescission: for any other breach, the contract relegates the Society to an action for damages. (Pl. exh. 3 at General Terms, ¶ 9). Thus, it is consistent with this interest for insolvency to be defined as the inability of Vestron to pay its debts: this would pose the immediate threat to the Society.

By contrast, Vestron's negative net worth, though of legitimate concern to the Society, poses no imminent danger. Rather, if this financial condition causes Vestron to default in its substantive obligations under the contract, the Society may seek recourse through the notice and cure provisions. Indeed, the Society has argued that Vestron has violated the best efforts clause, as will be discussed below. Thus, because Vestron's construction of the term "insolvent" as used in the contract is the more persuasive, it is likely to prevail on this issue.

### 3. Best Efforts

The Society next contends that Vestron has failed to live up to its obligations to use its best efforts as required by the contract. Specifically, the Society complains that by entering into subdistribution agreements, Vestron has necessarily reduced the royalties that the Society will receive.

There is no doubt that Vestron's decision to engage subdistributors was based on self-interest: it could no longer carry the costs of its own foreign marketing network, and it needed the cash infusion that would come from guarantee payments under the subdistribution agreements.

Vestron's motives, however, are irrelevant, as is the specific distribution structure that it is using in attempting to fulfill its obligations. *See Arnold Productions, Inc. v. Favorite Films Corp.,* 298 F.2d 540,

543–44 (2d Cir.1962) (best efforts clause not violated by use of subdistributors as long as contracting party continued to supervise compliance). Most significantly, the contract itself explicitly permits Vestron to enter into subdistribution agreements, and it excludes monies received by these subdistributors from gross receipts for purposes of calculating royalties due to the Society. (Pl. exh. 4, General Terms at ¶'s 5(b)(i) & 5(j)). Thus, the parties not only anticipated the utilization of subdistributors, they also foresaw the impact that it would have on royalties.

This is therefore not a case like *Bloor v. Falstaff Brewing Corp.,* 601 F.2d 609 (2d Cir.1979), where a best efforts clause was violated when a distributor took various steps to promote its own competing product in derogation of the obligation to maintain a high sales volume for the plaintiff's product. *Id.* at 610, 613–14. Rather, it is a case in which Vestron appears to be making reasonable marketing decisions in light of the resource constraints that it faces—decisions that are expressly permitted by the contract it is working under.

Finally, the Society's argument that the best efforts clause trumps the clause permitting subdistribution is unavailing. A best efforts requirement must be reconciled with other clauses in the contract to the extent possible, not used as a basis for negating them. *See Bloor v. Falstaff Brewing Corp.,* 454 F.Supp. 258, 266 (S.D. N.Y.1978), *aff'd,* 601 F.2d 609 (2d Cir.1979). Furthermore, the placement of the best efforts clause among the "Principal Terms" in contrast to the location of the subdistribution clause in the "General Terms" is hardly significant, particularly given the greater specificity of the term permitting subdistribution. *See John Hancock Mutual Life Ins. Co. v. Carolina Power & Light Co.,* 717 F.2d 664, 669 n. 8 (2d Cir.1983).

### 4. Other Alleged Breaches

The Society also complains of a variety of other alleged breaches by Vestron. Some of these, such as the failure to produce translations in time and a mix-up in the color used for packaging, are normal

operational glitches. (Tr. 262–64). The inability to launch in all foreign territories simultaneously, while seemingly more significant, had little impact, since release in one foreign language market would have little effect on another. (Tr. 261–62). Most serious is Vestron's failure to launch in three territories, but it has demonstrated ongoing good faith efforts to establish quality subdistribution arrangements in each country. (Tr. 366–72).

■ Even if Vestron did violate the contract in these respects, as well as by delegating its responsibilities to subdistributors, these breaches would not be sufficiently material to justify rescission by the Society. The Society continues to receive installments of the $1 million guarantee, and under any sales projections, a significant portion of the contract term will lapse before the Society is entitled to royalties beyond this amount.[5] Where a distributor has not wholly defaulted in making royalty payments and where its breaches, if any, can be compensated in damages, rescission is not an appropriate remedy. *See Nolan v. Sam Fox Publishing Co.*, 499 F.2d 1394, 1398–99 (2d Cir.1974). Finally, the contract itself limits the Society's remedies for these types of breaches to an action for damages and precludes rescission. (Pl. exh. 3 at General Terms, ¶ 9). Therefore, Vestron is likely to prevail against these claims of breach of contract at least to the extent of requiring continued performance.[6]

## C. *The Scope of Relief*

■ Vestron, then, has demonstrated a threat of irreparable injury and likelihood of success on the merits, entitling it to preliminary relief. In light of the schedule for releases negotiated by the parties, it is appropriate to require the Society to supply Vestron with masters for all programs to be released on videocassette through December, 1990. This tailors Vestron's relief to the harm it would suffer while litigation is pending, and it leaves disposition of the remaining titles to be determined at the conclusion of the litigation. In addition, the Society shall be enjoined from transferring any foreign rights which are the subject of the contract, lest Vestron be deprived of full relief in the event that it ultimately prevails. Finally, Vestron shall be required to post an injunction bond of $50,000, which should be sufficient to compensate the Society for delayed or disrupted foreign distribution of its product if termination is found to have been warranted.

## II. Motion to Disqualify Counsel

■ The Society moves to disqualify Vestron's counsel, Proskauer Rose Goetz & Mendensohn ("Proskauer"), because that firm previously represented the Society in significant trademark-related litigation in this Court: *National Geographic Society v. Conde Nast Publications, Inc.*, 87 Civ. 4228 (TPG). Pursuant to Disciplinary Rule 4–101(B) of the Code of Professional Responsibility, an attorney may not use a client's confidential information to the disadvantage of that client. Accordingly, "an attorney may be disqualified from representing a client in a particular case if

(1) the moving party is a former client of the adverse party's counsel;

(2) there is a substantial relationship between the subject matter of the counsel's prior representation of the moving party and the issues in the present lawsuit; and

(3) the attorney whose disqualification is sought had access to, or was likely to have had access to, relevant privileged information in the course of his prior representation of the client."

---

5. Vestron also contends that the price break on the domestic agreement should be considered additional consideration already received by the Society. It is unnecessary at this time to determine whether the domestic and international agreements were aspects of a single contract, since Vestron prevails on the basis of the international agreement standing alone.

6. The Society also contends that the contract is void because Locus, the signatory, is no longer in operation. However, the Society negotiated exclusively with Vestron, not with Locus as such, and the contract explicitly permits assignment. (Pl. exh. 3 at General Terms, ¶ 7).

*Evans v. Artek Systems Corp.*, 715 F.2d 788, 791 (2d Cir.1983).

In order to establish the second element—substantial relationship—the movant bears a heavy burden of proof. It must "show that the relationship is 'patently clear,' *see Silver Chrysler Plymouth, Inc. v. Chrysler Motors Corp.*, 518 F.2d 751 (2d Cir.1975) (overruled on other grounds by *Armstrong v. McAlpin,* 625 F.2d 433 (2d Cir.1980) (en banc), *vacated and remanded,* 449 U.S. 1106 [101 S.Ct. 911, 66 L.Ed.2d 835] (1981)), or that the issues involved in the two representations were 'identical' or 'essentially the same.' [*Government of India v. Cook Industries,* 569 F.2d 737, 740 (2d Cir.1978)]." *C.A.M., s.p.a. v. E.B. Marks Music, Inc.,* 558 F.Supp. 57, 59 (S.D.N.Y.1983).

Here, the evidence of a substantial relationship proffered by the Society consists of the affidavit of its corporate counsel, Suzanne Dupre. She attests that in connection with the *Conde Nast* litigation, she imparted to Proskauer "sensitive and confidential information concerning the manner in which those in the SOCIETY's upper management, including myself, work and think, and specifically, NATIONAL GEOGRAPHIC's approach to and strategy in litigation matters." Affidavit of Suzanne Dupre dated March 21, 1990 at ¶ 5. Further, she states that Proskauer was "exposed to my views, both personally and on behalf of the SOCIETY, as to when settlement was appropriate, when and on what basis the SOCIETY was prepared to litigate issues and generally how NATIONAL GEOGRAPHIC functioned during a protracted litigation." *Id.* at ¶ 6. Finally, Ms. Dupre contends that "the CONDE NAST litigation and the instant action bear a substantial relationship, in that NATIONAL GEOGRAPHIC's trademark is at issue once again in this action." *Id.* at ¶ 9.

This last statement betrays the emptiness of the Society's argument. This is not litigation over a trademark; it is a breach of contract case. Although the contract provides for trademark protection along with a host of other things, the trademark is not at issue here. Thus, there is no substantial relationship between this litigation and *Conde Nast.* Furthermore, the only information that the Society is alleged to have revealed during the course of its representation by Proskauer was its general litigation posture in trademark suits. But if insight into a former client's general "litigation thinking" were to constitute "relevant privileged information", then disqualification would be mandated in virtually every instance of successive representation. That clearly is not the law, and the Society's motion must be denied.

*Conclusion*

For the reasons set forth above, the plaintiff's motion for a preliminary injunction is granted. Upon posting of a $50,000 injunction bond, and pending final determination of this action:

(1) The National Geographic Society shall provide Vestron with the master tapes for all programs scheduled to be released through December, 1990, and

(2) The Society shall not transfer any rights which are the subject of its contract with Vestron.

Further, the defendant's motion to disqualify counsel for the plaintiff is denied.

SO ORDERED.