**CALAMAR ENTERPRISES, INC., Plaintiff,**

v.

**BLUE FOREST LAND GROUP, LLC and Timothy Locher, Defendants.**

**1:16-CV-00686 EAW**

United States District Court, W.D. New York.

Signed 12/02/2016

Robert C. Carbone, William F. Savino, Woods Oviatt Gilman LLP, Buffalo, NY, for Plaintiff.

Edward S. Bloomberg, Kevin J. English, Phillips Lytle LLP, Buffalo, NY, Matthew Robert Mazgaj, Phillips Lytle LLP, Jamestown, NY, Scott A. Wissel, Lewis Rice LLC, Kansas City, MO, for Defendants.

## DECISION AND ORDER

ELIZABETH A. WOLFORD, United States District Judge

### INTRODUCTION

The plaintiff has filed a motion to disqualify (Dkt. 9), contending that the law firm representing the defendants also currently serves as the plaintiff's law firm in another matter, and therefore cannot simultaneously handle this litigation on behalf of an adverse party. Alternatively, the plaintiff argues that the law firm previously represented it in connection with matters substantially related to the present litigation, resulting in the disclosure of relevant privileged information, and accordingly, disqualification is required.

After considering the record and holding oral argument on the motion, this Court concludes that the motion to disqualify was filed for tactical reasons as opposed to any real concern that defense counsel's prior representation will result in the disclosure of confidential information. Because defense counsel is not currently representing the plaintiff, and because there is not a substantial relationship between the prior representation and the current litigation, the motion to disqualify is denied.

### BACKGROUND

Plaintiff Calamar Enterprises, Inc. ("Calamar" or "Plaintiff") commenced this action on or about July 21, 2016, in New York State Supreme Court, Niagara County. (Dkt. 1 at ¶ 1). Defendant Blue Forest Land Group, LLC ("Blue Forest") and Timothy Locher ("Mr. Locher") (collectively "Defendants") timely removed the action to federal court based upon diversity jurisdiction. (Dkt. 1).

The case involves competing claims between the parties about whether Calamar, a commercial real estate developer, owes money to Blue Forest, a real estate development consultant, for services rendered pursuant to various Consulting Services Agreements. (Dkt. 1–2; Dkt. 5; Dkt. 10; Dkt. 16; Dkt. 26). Mr. Locher is the sole member of Blue Forest. (Dkt. 1 at ¶ 2(b)(iv)). Calamar has asserted causes of action against Defendants arising from alleged contractual breaches of the Consulting Services Agreements entered into between the parties, as well as a claim for fraudulent inducement. (Dkt. 10 at ¶¶ 80-95). Blue Forest has asserted counterclaims against Calamar for breach of contract, alleging that it is owed several hundred thousand dollars pursuant to the terms of the Consulting Services Agreements. (Dkt. 26 at 10-39).

Calamar alleges that, starting in 2012, it retained Defendants to "recommend to Calamar suitable sites for development within understood guidelines pertaining to location, parcel size, land cost, adequate rental charges, and other specified financial viability requirements." (Dkt. 10 at ¶ 3). The services at issue apparently related to the development of senior housing facilities in the Midwest Region of the United States, including in the States of Kansas, Missouri, Iowa and Nebraska. (Id. at ¶ 11). In order to select appropriate sites, Calamar alleges that it developed "Viability Parameters" and it was Defendants' obligation to "perform preliminary due diligence with respect to prospective sites to ensure that they met these Viability Parameters before recommending any site to Calamar for its consideration." (Id. at ¶ 14). Calamar alleges that Defendants failed to fulfill their obligations under the various Consulting Services Agreements by improperly performing the site selection services contemplated by the agreements. (Id. at ¶ 94). Blue Forest denies these claims, instead asserting various counterclaims alleging that Calamar has reneged on its payment obligations under the terms of

the agreements. (Dkt. 26). In addition, Defendants have filed a motion to dismiss the fraudulent inducement claim, as well as all claims asserted against Mr. Locher. (Dkt. 17).

## PLAINTIFF'S MOTION
## TO DISQUALIFY

On September 19, 2016, Calamar filed a motion to disqualify the law firm of Phillips Lytle LLP ("Phillips Lytle"), which has appeared on behalf of Defendants in this action. (Dkt. 9). Calamar bases its motion to disqualify on two alternative grounds: (1) Phillips Lytle currently represents Calamar, and thus is disqualified under the *per se* rule applicable to concurrent representations (Dkt. 9–12 at 4-7); and (2) Phillips Lytle formerly represented Calamar, there is a substantial relationship between that prior representation and the current litigation, and Phillips Lytle gained access to relevant privileged information during its prior representation of Calamar (*id.* at 7-12).

According to Calamar, Phillips Lytle partner Frederick G. Attea has assisted Calamar from 2011 through the present "in conducting fundraising meetings with prospective investors and financial partners for its senior housing projects." (Dkt. 9–12 at 2). In support of that contention, Calamar has submitted a declaration from Kenneth M. Franasiak, President and Chief Executive Officer of Calamar. (Dkt. 9–5). In that declaration, Mr. Franasiak states, in relevant part, as follows:

- Calamar developed so-called "Viability Parameters" which it considers "proprietary and the source of a significant competitive advantage" (Dkt. 9–5 at ¶ 16);

- In 2011, Calamar formed an investment fund to support its business strategy in senior housing (*id.* at ¶ 10);

- In July 2011, Mr. Franasiak reached out to Mr. Attea to seek his and Phillips Lytle's assistance with the senior housing investment fund (*id.* at ¶ 11);

- Calamar had previously retained Phillips Lytle in 2010, to assist with site plan approval and zoning matters pertaining to a project in Orchard Park, New York (*id.* at ¶ 12);

- Phillips Lytle sent an engagement letter to Mr. Franasiak dated August 5, 2011, confirming that Calamar had retained the firm "in connection with certain matters relating to a debt financing of Calamar Senior Residence Properties," with legal expenses capped at $2,500 (Dkt. 9–6); and,

- That August 2011 engagement letter was subsequently cancelled, and Phillips Lytle sent a new engagement letter to Mr. Franasiak dated October 25, 2012, confirming that the firm had been retained "to provide legal services . . . in connection with certain potential financing alternatives. . . ." (Dkt. 9–7).

Mr. Franasiak contends in his declaration that Phillips Lytle has represented Calamar on a continuing basis for approximately five years, that the October 2012 engagement letter remains in effect, and that, in connection with that representation, Calamar has disclosed to Phillips Lytle "a wealth of private and confidential business information pertaining to Calamar's finances and senior housing projects . . . in reliance upon the attorney-client relationship." (Dkt. 9–5 at ¶¶ 14-16, 21). At the oral argument of this matter, Plaintiff's counsel handed up to the Court unredacted copies of exhibits representing documents disclosed to Mr. Attea, and those exhibits reveal various financial information pertaining to Calamar.

However, to be sure, the pre-2016 examples referenced by Mr. Franasiak relating to this alleged ongoing and continuing attorney-client relationship are limited to the following:

■ In August 2011, Mr. Attea facilitated discussions with the investment bank FBR Capital on behalf of Calamar, and Calamar provided Mr. Attea with financial information concerning its performance with past senior housing projects to facilitate those discussions (*id.* at ¶¶ 22–25; Dkt. 9–8; Dkt. 28 at ¶¶ 8–9; Dkt. 28–1); and,

■ In July 2011 and April/May 2012, Calamar provided Mr. Attea with a confidential presentation that is issued to investors with an interest in senior housing projects ("Senior Housing Presentation") (Dkt. 9–5 at ¶¶ 26–29; Dkt. 9–9; Dkt. 9–10; Dkt. 28 at ¶ 10; Dkt. 28–2).

Then, according to Mr. Franasiak, in January 2016, Mr. Attea continued working on behalf of Calamar "in furtherance of our capital raise efforts, including on financing for the portfolio in which the projects at issue were involved." (Dkt. 9–5 at ¶ 30). Mr. Franasiak cites to communications between Mr. Attea and Stampede Capital, a potential investor with Calamar, and allegedly confidential information that Calamar provided to facilitate those discussions. (*Id.* at ¶¶ 31-33; Dkt. 9–11).

Mr. Franasiak also raises the issue that Phillips Lytle is counsel to United Materials. (Dkt. 9–5 at ¶ 40). Mr. Franasiak alleges that he and another individual own 45.5% of the stock of United Materials. (*Id.*). Nonetheless, Plaintiff's counsel confirmed at oral argument that this is not a basis for the motion to disqualify.

### DEFENDANTS' OPPOSITION TO THE MOTION

Mr. Attea has submitted a declaration confirming that he provided legal services to Calamar during 2011 through 2012 "in connection with financing of existing senior living facilities in the Western New York area." (Dkt. 23–1 at ¶ 3). However, Mr. Attea states that after that work concluded in late 2012, he did not provide any further legal services for Calamar. (*Id.* at ¶ 4). Mr. Attea further states that he and Mr. Franasiak are social acquaintances, and they sit on a board together. (*Id.* at ¶ 7). Through that social relationship, and as a personal favor, Mr. Attea acknowledges that within the past year, he put Mr. Franasiak in touch with a contact to help line up financing for an existing portfolio of senior residences in Western New York, and that Mr. Attea passed on financial materials and information from Mr. Franasiak to this contact. (*Id.* at ¶¶ 8-11). According to Mr. Attea, he did not read or review the financial materials and information, he did not record any legal time for this more recent contact, and he did not send Calamar a bill. (*Id.* at ¶¶ 11-12). Mr. Attea confirms that he has no information regarding the specific facts of the current litigation, and denies that it has anything to do with his prior contact with Mr. Franasiak. (*Id.* at ¶¶ 13-14).

Additionally, in its opposition papers, Defendants point out that Calamar initially based its claim of a conflict on an entirely different (and incorrect) theory, and furthermore, Phillips Lytle is adverse to Calamar in other unrelated litigation, and yet, Calamar has never raised any claim of a conflict in connection with that other litigation. (Dkt. 23 at ¶¶ 5, 8-13; Dkt. 24 at ¶ 3; Dkt. 24–1).

### LEGAL STANDARD

██ "The authority of federal courts to disqualify attorneys derives from their inherent power 'to preserve the integrity of the adversary process.'" *Hempstead*

*Video, Inc. v. Inc. Vill. of Valley Stream,* 409 F.3d 127, 132 (2d Cir. 2005) (quoting *Bd. of Educ. of City of N.Y. v. Nyquist,* 590 F.2d 1241, 1246 (2d Cir. 1979)). Motions to disqualify are generally viewed with disfavor, and "[w]hether to grant a motion to disqualify is committed to the discretion of the court." *Wieme v. Eastman Kodak Co.,* No. 02–CV–6021L, 2004 WL 2271402, at *1 (W.D.N.Y. Sept. 7, 2004). In evaluating a motion to disqualify, a court must balance " 'a client's right freely to choose his counsel' against 'the need to maintain the highest standards of the profession.' " *Hempstead Video,* 409 F.3d at 132 (citations omitted). Moreover, while the New York Code of Professional Responsibility can "provide general guidance," it is not binding on a federal court assessing the merits of a motion to disqualify. *Id.* ("[N]ot every violation of a disciplinary rule will necessarily lead to disqualification. . . .").

■ A party moving for disqualification carries "a 'heavy burden' and must satisfy 'a high standard of proof.' " *Wieme,* 2004 WL 2271402, at *1 (quoting *Evans v. Artek Sys. Corp.,* 715 F.2d 788, 791, 794 (2d Cir. 1983)). Indeed, a court faced with a disqualification motion must recognize that "disqualification has an immediate adverse effect on the client by separating him from counsel of his choice, and that disqualification motions are often interposed for tactical reasons." *Bd. of Educ. of City of N.Y.,* 590 F.2d at 1246. "Speculation regarding the divulging of client confidences will not suffice to grant a motion to disqualify." *Hickman v. Burlington Bio–Med. Corp.,* 371 F.Supp.2d 225, 229 (E.D.N.Y. 2005). "At the same time, however, the Second Circuit has instructed that if there are doubts about the matter, those doubts should be resolved in favor of disqualification." *Wieme,* 2004 WL 2271402, at *2.

■ The standard for disqualification depends on whether the representation is concurrent or successive. *Hempstead Video,* 409 F.3d at 133. For concurrent representation, it is *"prima facie* improper" for an attorney to simultaneously represent a client and another party with interests directly adverse to that client. *Id.* Under those circumstances, a *"per se"* standard applies and the attorney must be disqualified unless he is able to demonstrate "at the very least, that there will be no actual or *apparent* conflict in loyalties or diminution in the vigor of his representation." *Id.* (emphasis in original).

In contrast, where the representation is successive, an attorney may be disqualified where there is a substantial relationship between the subject matter of the prior representation and the current matter, and the attorney whose disqualification is sought had access to or was likely to have had access to relevant privileged information during that prior representation. *Id.*

## CONCURRENT REPRESENTATION

Phillips Lytle was engaged by Defendants to handle this litigation on or about August 2, 2016. (Dkt. 24 at ¶ 2). According to Calamar, because it never affirmatively terminated the attorney-client relationship that was formed in 2011-2012, Phillips Lytle continues to represent it and, therefore, cannot simultaneously represent Defendants in this litigation. (Dkt. 28–3 at 2-3). Calamar cites to Mr. Attea's activities earlier in 2016, to support its argument that the attorney-client relationship was continuing in nature, and continues to exist to this day.

There is no dispute that an attorney-client relationship between Phillips Lytle and Calamar was formed in 2011-2012. Calamar has presented evidence that work was done by Phillips Lytle during that

time frame, and Phillips Lytle agrees. However, Mr. Attea has represented that the legal work ended in late 2012, and Calamar has not presented any evidence of continuing legal services after that time period, with the exception of its claim that in early 2016, Mr. Attea again became involved in attempting to facilitate financing for the company. In other words, even according to Calamar's version of events, there was at least a three year gap in time where no legal services were provided. Calamar's argument that somehow the attorney-client relationship continued throughout that three year time period because Phillips Lytle did not affirmatively terminate the relationship lacks merit.

██ "When an attorney-client relationship ends depends largely on the purpose for which it was created...." *Revise Clothing, Inc. v. Joe's Jeans Subsidiary, Inc.*, 687 F.Supp.2d 381, 389–92 (S.D.N.Y. 2010). As explained by the court in *Revise:*

In what is perhaps the most typical situation, an attorney-client relationship created between a lawyer and a lay party is terminated, simply enough, by the accomplishment of the purpose for which it was formed in the first place. This rule is really a corollary of the principles that an attorney-client relationship arises only as to the particular matter or transaction on which the lawyer has expressly or implicitly bound himself to work, and that, unless the lawyer is on a general retainer covering the entire period involved, the relationship does not extend to business or affairs of the lay party as to which the lawyer was not initially contracted.

*Id.* at 389–390. In that case, the court rejected an argument similar to the one advanced by Calamar, finding that, despite the fact that the attorney-client relationship had not been formally terminated, the attorney-client relationship ended when the purpose of the retainer agreement between the firm and client had been completed. Language in an engagement letter providing for the method of termination did not dictate a different result:

[T]his language adds nothing to the analysis. First, this provision appears to refer to the means by which counsel may withdraw during the course of an ongoing matter which may, for example, require leave of court. As such, it is irrelevant to the issue of when a matter is concluded. Second, even if it did relate to termination of the attorney-client relationship at the completion of an engagement, this provision simply requires compliance with 'applicable law, court rules, and the New York Code of Professional Responsibility,' none of which obligate counsel to send its client a letter announcing the termination.

*Id.* at 392. Similarly, the court rejected the argument that subsequent *"de minimis* legal work, performed as a courtesy for an existing client,"* extended the attorney-client relationship indefinitely. *Id.* at 391.

Thus, according to the *Revise* court's reasoning, the *per se* disqualification rule did not apply because the moving party was not a current client. *See also Nat. Westminster Bank PLC v. Empire Energy Mgmt. Sys., Inc.*, No. 93 Civ. 5331 (LMM), 1996 WL 709763, at *6 (S.D.N.Y. Dec. 10, 1996) (declining to apply *"per se"* rule of disqualification where "dual representation, if any, was negligible" and law firm did not bill for this legal work).

██ Here, Calamar's claims that it believed Phillips Lytle was continuously representing it since 2011-2012, even though no work was performed and no legal bills were rendered, is speculative and unsupported. These types of conclusory claims cannot create an attorney-client relationship nor justify disqualification. Even tak-

ing Mr. Franasiak's statement at face value, that he continued to believe Phillips Lytle represented Calamar, that statement, in and of itself, is not sufficient to create an attorney-client relationship. Mr. Franasiak's alleged belief is plainly unreasonable under the circumstances. *See Med. Diagnostic Imaging, PLLC v. CareCore Nat., LLC*, 542 F.Supp.2d 296, 307 (S.D.N.Y. 2008) (among the factors a court will consider when determining whether an attorney-client relationship exists is not only whether a client believes an attorney-client relationship exists, but also whether that belief was reasonable); *Knigge ex rel. Corvese v. Corvese*, No. 01 CIV. 5743 (DLC), 2001 WL 830669, at *3 (S.D.N.Y. July 23, 2001) ("A party's 'unilateral belief' that he is represented by counsel 'does not confer upon him the status of client unless there is a reasonable basis for his belief.' ").

Mr. Attea's limited communication with Mr. Franasiak earlier this year, resulting in no legal charges, does not alter the analysis. An objective view of Mr. Attea's activities earlier this year supports the conclusion that his *de minimis* efforts were simply a courtesy, as opposed to legal services, and in any event, that limited activity certainly did not revive the attorney-client relationship that had been dormant for over three years.

Based on the record before the Court, it is apparent that the attorney-client relationship between Phillips Lytle and Calamar ended in 2012. As a result, the *per se* rule does not apply. When Phillips Lytle was retained to represent Defendants in this action in August 2016, it no longer had an attorney-client relationship with Calamar.

## SUCCESSIVE REPRESENTATION

■ The Second Circuit has set forth the following standard for when disqualification is required due to an attorney's prior representation of a client:

(1) the moving party is a former client of the adverse party's counsel;

(2) there is a substantial relationship between the subject matter of the counsel's prior representation of the moving party and the issues in the present lawsuit; and

(3) the attorney whose disqualification is sought had access to, or was likely to have had access to, relevant privileged information in the course of his prior representation of the client.

*Evans v. Artek Sys. Corp.*, 715 F.2d 788, 791 (2d Cir. 1983).

■ In assessing whether there is a substantial relationship between the subject matter of the counsel's prior representation and the present litigation, "disqualification should be ordered 'only upon a showing that the relationship between the issues in the prior and present cases is "patently clear." '" *Wieme*, 2004 WL 2271402, at *2 (quoting *Government of India v. Cook Indus., Inc.*, 569 F.2d 737, 739–40 (2d Cir. 1978)). As explained in *Wieme*:

Disqualification has been granted or approved . . . only when the issues involved have been identical or essentially the same. Disqualification will ordinarily be required whenever the subject matter of the suit is sufficiently related to the scope of the matters on which the firm represented the former client so as to create a realistic risk . . . that unfair advantage will be taken of the former client.

2004 WL 2271402, at *2 (quotations omitted, alterations omitted, citations omitted). *See also Vestron, Inc. v. Nat'l Geographic Soc'y*, 750 F.Supp. 586, 595 (S.D.N.Y. 1990) ("In order to establish the second element—substantial relationship—the

movant bears a heavy burden of proof. It must show that the relationship is patently clear, or that the issues involved in the two representations were identical or essentially the same." (citations and quotations omitted)). If the first two prongs of the Secord Circuit's substantial relationship test are met, "satisfaction of the third is presumed." *Wega v. Ctr. for Disability Rights, Inc.*, No. 06–CV–6375T, 2008 WL 907369, at *2 (W.D.N.Y. March 31, 2008). In other words, if a substantial relationship between the prior and existing representation is established, this "creates a rebuttable presumption that the former client imparted to counsel confidential information relevant to the present suit." *Wieme*, 2004 WL 2271402, at *2.

▆▆ Here, Phillips Lytle's prior representation of Calamar involved assistance with financing for existing assisted living facilities in Western New York. In contrast, the present litigation involves a contract dispute over Defendants' efforts to find properties in the Midwest where Calamar could build assisted living facilities. Under no reasonable view of the facts could it be concluded that there is a substantial relationship between the subject matters of the prior representation and the current matter. Indeed, courts have rejected disqualification motions under circumstances involving much more significant connections between the prior representation and current matter. *See, e.g., Revise Clothing, Inc.*, 687 F.Supp.2d 381 (although both prior representation and current litigation involved apparel that may be subject to trademark protection, the matters were not sufficiently similar to warrant disqualification); *Norris v. City of New Haven*, No. 3:04cv543 (MRK), 2006 WL 2567866 (D. Conn. Sept. 5, 2006) (denying disqualification motion where city's former deputy corporation counsel represented plaintiff in employment action against city); *Wieme*, 2004 WL 2271402

(reversing magistrate judge's disqualification of attorneys representing plaintiff in discrimination lawsuit against Eastman Kodak Company, even though same attorneys had previously defended the company in discrimination lawsuits); *Vestron, Inc.*, 750 F.Supp. 586 (finding no substantial relationship between prior trademark litigation and current breach of contract litigation, and rejecting moving party's claims that prior representation had exposed counsel to sensitive and confidential information, including company's litigation strategy and tactics).

Calamar contends that the most critical issue in the case is whether Blue Forest adequately provided services to Calamar in its performance of site selection services "without proper adherence to the Viability Parameters." (Dkt. 9–12 at 10). This may very well be the critical issue in the case—however, in a speculative attempt to link that so-called critical issue to Phillips Lytle's prior representation, Calamar contends that the firm's knowledge of those Viability Parameters and related financial information necessarily establishes the substantial relationship between the prior representation and current matter. (*Id.*). Calamar's logic falls flat.

Knowledge of the Viability Parameters or financial information related to Calamar, in and of itself, does not justify disqualification. There must be virtually identical issues between this litigation and Phillips Lytle's prior legal work. "Just because [the moving attorney's prior attorney] ... may have knowledge of facts that are relevant to the issues brought before the Court does not mean that the legal representation he provided to the [moving party] ... concerned legal issues that are identical to those raised in the present litigation." *Pacheco Ross Architects, P.C. v. Mitchell Assocs. Architects*, Civ. No. 1:08–CV–466 (GTS/RFT), 2009 WL

1514482, at *5 (N.D.N.Y. May 29, 2009). In other words, knowledge of Calamar's Viability Parameters and related financial information, as gleaned in Phillips Lytle's efforts to facilitate financing for Calamar, in no way makes the issues in this litigation substantially similar to that prior representation.

Calamar has failed to satisfy the Second Circuit's standard for establishing that disqualification is required due to Phillips Lytle's prior representation. Because Phillips Lytle's prior representation of Calamar, and the present litigation, are not substantially related, disqualification is not warranted.

## CONCLUSION

For the foregoing reasons, it is hereby ordered that Plaintiff's motion to disqualify (Dkt. 9) is denied. Plaintiff also has filed a motion to stay the pending motion to dismiss filed by Defendants. (Dkt. 19). That motion is denied as moot. The Court will issue a separate scheduling order with respect to the pending motion to dismiss.

SO ORDERED.