IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| RIJU RAVINDRAN, BYJU'S ALPHA, INC., and TANGIBLE PLAY, INC., | § § § | No. 463, 2023 |
| Defendants Below, Appellants, | § § | |
| v. | § § | Court Below: Court of Chancery of the State of Delaware |
| GLAS TRUST COMPANY LLC, in its capacity as Administrative Agent and Collateral Agent, and TIMOTHY R. POHL, | § § § § § | C.A. No. 2023-0488 |
| Plaintiffs Below, Appellees. | § § § | |

Submitted: July 24, 2024
Decided: September 23, 2024

Before **VALIHURA**, **LEGROW**, and **GRIFFITHS**, Justices.

Upon appeal from the Court of Chancery. **AFFIRMED**.

Joseph B. Cicero, Esquire (*argued*), Ryan M. Lindsay, Esquire, Chipman Brown Cicero & Cole, LLP, Wilmington, Delaware. *Of Counsel:* Sheron Korpus, Esquire, David M. Max, Esquire, Sondra D. Grigsby, Esquire, Kasowitz Benson Torres LLP, New York, New York *for Appellants*.

Brock E. Czeschin, Esquire, Susan Hannigan Cohen, Esquire, Nicole M. Henry, Esquire, Richards, Layton & Finger, P.A., Wilmington, Delaware *for Appellee Timothy R. Pohl*. Lauren K. Neal, Esquire, Elizabeth A. Mullin Stoffer, Esquire, Morris, Nichols, Arsht & Tunnell LLP, Wilmington, Delaware *for Appellee GLAS Trust Company LLC, in its capacity as Administrative Agent and Collateral Agent*. *Of Counsel:* George W. Hicks, Jr., Esquire, (*argued*), Kirkland & Ellis LLP, Washington, D.C. Seth M. Cohen, Esquire, Kirkland & Ellis LLP, San Francisco, California.

**VALIHURA**, Justice:

*INTRODUCTION*

This appeal follows a half-day trial on a paper record where the Court of Chancery determined, pursuant to 8 *Del. C.* § 225, that Timothy R. Pohl ("Pohl") was the sole director and officer of Byju's Alpha, Inc. ("Byju's Alpha"). Byju's Alpha is a wholly-owned Delaware subsidiary of Think and Learn Private Ltd. ("T&L"), a company founded by Byju Ravindran and organized under Indian law. On November 24, 2021, Byju's Alpha and its guarantors, including T&L, entered into a credit and guaranty agreement to govern the terms of a loan facility providing an aggregate principal amount of $1.2 billion (the "Term Loans") to Byju's Alpha. The counterparties were GLAS Trust Company LLC ("GLAS"), in its capacity as administrative and collateral agent, and following the loan's syndication, thirty-seven other lenders (the "Lenders"). The Lenders believed an event of default had occurred. They had their agent, GLAS, take control and install Pohl as the sole director and officer. T&L's subsidiaries – Byju's Alpha and Tangible Play, Inc. ("Tangible") – claim that there was no event of default. Therefore, they argue that fellow Appellant, Riju Ravindran, who served as Byju's Alpha's sole director and officer from its formation, remains the sole director and officer of Byju's Alpha – not Pohl.

This case requires us to address three main issues. *First*, is the application of the credit agreement's forum selection clause properly before this court? *Second*, did an agreement between the parties require Whitehat Education Technology Private Ltd. ("Whitehat") – a subsidiary of T&L – to become a guarantor and, if so, was GLAS justified in exercising its default rights? And *third*, can Appellants successfully assert an impossibility defense on the grounds that it was unforeseeable that the Reserve Bank of

2

India (the "RBI") – which sets the regulations for large overseas lending agreements and approves who may serve as a guarantor under those agreements – would remove the exception that allowed Whitehat to serve as a guarantor? For the reasons set forth herein, we AFFIRM the decision of the Court of Chancery.

## I.  RELEVANT FACTUAL AND PROCEDURAL BACKGROUND

### A. The Parties

Defendants Below-Appellants are Riju Ravindran, Byju's Alpha, and Tangible (collectively, "Appellants"). Byju's Alpha is incorporated in Delaware and has its principal place of business in Illinois.[1] Byju's Alpha was formed for financing purposes and never had any active business operations.[2] Byju's Alpha was incorporated two months prior to the execution of the credit and guaranty agreement (the "Credit Agreement"). On September 27, 2021, Ravindran was appointed as the sole director and officer of Byju's Alpha.[3] Tangible is a Delaware corporation with its principal place of business in California.[4] Non-party T&L is an education technology company formed under Indian law.[5] Biju's Alpha and Tangible are wholly-owned subsidiaries of T&L. T&L was founded

---

[1] A593 (Verified Complaint ¶ 38). *See* A571–A626 (Verified Complaint Pursuant to 8 *Del. C.* 225, dated May 3, 2023) [hereinafter "Complaint" or "Compl."].

[2] Many of the facts are taken from the Court of Chancery's November 2, 2023 telephonic bench ruling at 4:21–5:2 [hereinafter "Bench Ruling"]. *See also* A575 (Compl. ¶ 4); A1539 (Joint Pre-Trial Stipulation and Order ¶¶ 34–35, dated July 25, 2023) [hereinafter "Pre-Trial Stipulation"].

[3] A1539 (Pre-Trial Stipulation ¶ 36). Both parties recognize that Ravindran was the sole director and officer until March 2, 2023. However, on and after March 3, 2023, the parties dispute who was Byju's Alpha's sole director and officer. *Id*.

[4] A594 (Compl. ¶ 40).

[5] Bench Ruling at 4:19–22.

by Byju Ravindran – the older brother of Appellant Ravindran.[6] Byju's Alpha, Tangible, and Whitehat,[7] are all subsidiaries of T&L.[8]

Plaintiffs Below-Appellees are GLAS and Timothy R. Pohl (collectively, "Appellees"). GLAS is a New Hampshire LLC with its principal place of business in New Jersey.[9]

### B. The Credit Agreement

On November 24, 2021, T&L, Byju's Alpha, GLAS, and others entered into the Credit Agreement.[10] T&L served as the Parent Guarantor, Byju's Alpha as the borrower, and GLAS as the Administrative Agent and the Collateral Agent.[11] The Credit Agreement set forth the terms for a loan providing an aggregate principal amount of $1.2 billion to Byju's Alpha (the "Term Loans").[12] Byju's Alpha was expected to pay back the Term Loans in quarterly installments of .25% of the aggregate principal, with the remainder of the principal due, absent an acceleration, on the Term Loans' maturity date.[13] A syndicate

---

[6] *See* A575 (Compl. at 5 n.2) (addressing the familial relationship between Byju Ravindran and the Appellant Ravindran). To avoid confusion with his brother, Byju Ravindran's first name is included. We intend no familiarity or disrespect.

[7] Whitehat is referred to as "Whitehat India" throughout the Credit Agreement. A52–A284 (Credit and Guaranty Agreement among Think and Learn Private Limited and BYJU's Alpha, Inc., dated Nov. 24, 2021) [hereinafter "Credit Agreement"].

[8] Bench Ruling at 5:22–23; A674 (Unsworn Foreign Declaration of Riju Ravindran ¶ 9).

[9] A592 (Compl. ¶ 36); A60 (Credit Agreement at 1).

[10] Bench Ruling at 5:3–5; *see* A53 (Credit Agreement Title page).

[11] Bench Ruling at 5:3–5; *see* A53 (Credit Agreement Title page). Non-parties Morgan Stanley Senior Funding Inc. and JPMorgan Chase Bank, N.A. served as Joint Lead Arrangers and Joint Bookrunners. *Id.*

[12] A60 (Credit Agreement at 1).

[13] A594 (Compl. ¶ 42).

of thirty-seven financial institutions bought the Term Loans providing the $1.2 billion.[14]

The Lenders were given the ability to buy and sell the loans and loan commitments.[15]

Lenders who represented more than fifty percent of the total outstanding loan commitments under the Credit Agreement were defined as "Required Lenders."[16]

In the event of default, GLAS, at the request of the Required Lenders, could act to enforce the Lenders' rights.[17] The loan documents included a pledge agreement and a security agreement. The pledge agreement was entered into between GLAS and Byju's Alpha's affiliate and pledged 100% of Byju's Alpha's common stock as collateral for the Term Loans.[18] It entitled GLAS to take control of those shares upon the occurrence of a "trigger event." GLAS's service of a default notice constitutes a "trigger event" as defined by the pledge agreement.[19]

At the time of the Credit Agreement's execution, three subsidiaries of T&L, consisting of Tangible and two non-parties, entered into the agreement and were referred to as the "Initial Guarantor[s]."[20] The Credit Agreement contains language discussing

[14] Bench Ruling at 5:10–12; A1593 (Section 225 Trial Transcript at 6:14–19, dated Aug. 4, 2023) [hereinafter "Section 225 Trial Tr."].

[15] Bench Ruling at 5:12–13; A203 (Credit Agreement § 10.4(c)(i)). Lenders, however, could not sell to the Borrower, the Parent Guarantor, or an Affiliate of the Parent Guarantor. *Id.*

[16] Bench Ruling at 5:16–19; A102 (Credit Agreement § 1.1 "Required Lenders"). We also refer to the Required Lenders as the "Lenders".

[17] Bench Ruling at 5:13–16; A183 (Credit Agreement § 8.1 (p)(i)).

[18] Bench Ruling at 8:20–24.

[19] *Id.* at 9:1–4.

[20] A88 (Credit Agreement § 1.1 "Initial Guarantor").

Whitehat acceding to the Credit Agreement as a guarantor after receiving approval from the RBI.[21]

### C. Overseas Direct Investment Regulations

The RBI sets the regulations for Overseas Direct Investment ("ODI"). The ODI regulations, which are revised periodically, determine who can serve as a guarantor with the RBI's approval. When the Credit Agreement was negotiated and executed, the RBI had been operating under the same ODI regulations since 2004 (the "Former ODI Regulations").[22] ODI regulations require the approval of the RBI before an Indian entity can provide an overseas guarantee when the loan exceeds $1 billion in any financial year (the "Amount Test"), or the loan exceeds 400% of the net worth of the guarantor (the "Net Worth Test").[23] Because the loans exceeded $1 billion, Whitehat and T&L were required to receive RBI approval prior to becoming guarantors.[24] Because Whitehat's calculated net worth at the time of the negotiations was negative,[25] it failed to satisfy the Net Worth Test. However, the Former ODI Regulations allowed a subsidiary to rely on – and in effect

---

[21] *See* A153 (Credit Agreement § 5.9(c)).

[22] Bench Ruling at 6:2–4; A1314 (Expert Declaration of Mr. Zal T. Andhyarujina, S.A Pursuant to 10 *Del. C.* 5356, ¶ 3 (viii), dated June 28, 2023) [hereinafter "Andhyarujina Declaration"].

[23] Bench Ruling at 6:7–12; A1314–A1315 (Andhyarujina Declaration ¶ 3 (viii)).

[24] Bench Ruling at 6:16–19. The parties to the Credit Agreement recognized that T&L and Whitehat would require approval from the RBI to become guarantors. A100 (Credit Agreement § 1.1 "RBI Approval").

[25] A675 (Unsworn Foreign Declaration of Riju Ravindran ¶ 15, dated July 14, 2023).

"borrow" from – its parent entity's net worth to satisfy the Net Worth Test (the "Borrowing Exception").[26] T&L then acquired Whitehat in August 2020 for $300 million.[27]

The Credit Agreement contains multiple covenants concerning the approval from the RBI. The key covenants are: (i) Section 5.9(c), which addresses Whitehat acceding to the Credit Agreement; (ii) Section 5.17(d), which addresses T&L's role in helping Whitehat accede; and (iii) Section 5.1, which requires the regular submission of financial reports. Section 5.9(c) provides that "[o]n and from the earlier of (i) April 1, 2022 and (ii) within five Business Days of the date RBI approval is received, Whitehat . . . shall accede to [the Credit Agreement] and the Onshore Guarantee Deed as a Guarantor[.]"[28] Section 5.17(d) requires that T&L use commercially reasonable efforts to secure RBI approval on or before April 1, 2022:

> [T&L] will use its *reasonable commercial efforts* to procure the RBI approval on or prior to April 1, 2022 in order that it and Whitehat India may guarantee the Covered Obligations in an amount not less than the Guarantee Maintenance Amount and if so obtained, shall ensure that it and Whitehat India guarantee . . . the Covered Obligations up to the maximum amount permitted by the RBI Approval. For the avoidance of doubt, (i) any failure to obtain the RBI approval prior to April 1, 2022 (whether in whole or in part) *shall not cause a breach* of the Guarantee Maintenance Requirement or require any mandatory prepayment of the Term Loans . . . .[29]

---

[26] Bench Ruling at 6:12–15; A1315 (Andhyarujina Declaration ¶ 3 (x)).

[27] A1543 (Pre-Trial Stipulation ¶ 56).

[28] A153 (Credit Agreement § 5.9(c)).

[29] A157 (Credit Agreement § 5.17(d)) (emphasis added); Bench Ruling at 7:7–23.

## D. Events of Default

Section 8.1 of the Credit Agreement defines the "Events of Default."[30] Section 8.1(e), recognizes that an event of default occurs when:

> [A]ny Loan Party shall fail to observe or perform any covenant, condition or agreement contained in any of the Loan Documents . . . and such failure shall continue unremedied for a period of 45 days after notice thereof from [GLAS] to [Byju's Alpha] (which notice will be given at the request of any Lender.)[31]

Thus, in the event of default, GLAS may, upon the request of the Lenders, deliver to Byju's Alpha a notice of acceleration and default.[32] GLAS would then inform Byju's Alpha that it is exercising its contractual remedies on the Lenders' behalf, including: "[e]nforc[ing] any and all Liens and security interests created pursuant to the Collateral Documents in addition to any other remedies available under the Loan Documents or applicable law."[33]

These additional remedies include exercising the Pledge Agreement entered into by GLAS and Byju's Alpha's affiliates.[34] One thousand shares of common stock, accounting for 100% of Byju's Alpha's equity, was pledged as collateral under the Credit Agreement.[35] If a "trigger event" occurs, GLAS is entitled to take control of Byju's Alpha's equity.[36] The

---

[30] A180–A183 (Credit Agreement § 8.1 "Events of Default").

[31] Bench Ruling at 8:1–9; A180 (Credit Agreement § 8.1(e)).

[32] Bench Ruling at 8:10–13; B015 (Security Agreement § 14.1–2, dated Nov. 24, 2021) [hereinafter "Security Agreement"].

[33] Bench Ruling 8:13–19; A183 (Credit Agreement § 8.1(p)).

[34] Bench Ruling at 8:20–22; *see also* B038–B068 (Pledge Agreement, dated Nov. 24, 2021) [hereinafter "Pledge Agreement"].

[35] Bench Ruling at 8:21–24; B064 (Pledge Agreement at E-3).

[36] Bench Ruling at 9:1–2; A148–A150 (Credit Agreement § 5.1); B050–B052 (Pledge Agreement § 7.1).

service of a default notice by GLAS to Byju's Alpha constitutes a "trigger event" under the Pledge Agreement.[37]  In addition, a "trigger event" grants GLAS a power of attorney under Security Agreement Section 19.1.[38]  This allows GLAS "to exercise any of the rights conferred on [GLAS] in relation to the Collateral Assets or under any Loan Document or under any law."[39]

For instance, Section 5.1 of the Credit Agreement requires T&L to provide both unaudited quarterly financial statements and audited financial statements at specific intervals.[40]  Failing to deliver these statements constitutes an "event of default" if the failure would "continue unremedied for a period of 45 days."[41]  However, the failure may be cured at any time prior to the delivery of a default notice.[42]  When an event of default occurs, the Required Lenders may request the delivery of a default notice.  Upon GLAS's delivery of the notice, the outstanding loan balance becomes immediately due and payable.[43]

### E. Attempted Approval and First Limited Waiver

At the time of executing the Credit Agreement on November 24, 2021, the RBI had not approved either party to serve as a guarantor.  Three months earlier, on August 9, 2021,

---

[37] Bench Ruling at 9:2–4; B006 (Security Agreement § 1.1 "Trigger Event").  To be a "trigger event[,]" the service of a notice to Byju's Alpha by GLAS would have to be made "in accordance with Section 8.1 . . . of the Credit Agreement during the continuance of an Event of Default."  *Id.*

[38] B017–B018 (Security Agreement § 19.1).

[39] *Id.*; Bench Ruling at 9:5–10.  Specifically, under Section 19, GLAS has power of attorney over Byju's Alpha's corporate parent Byju's Pte. Ltd.  *See* B024 (Security Agreement at 22).

[40] Bench Ruling at 9:13–15; A148–A150 (Credit Agreement § 5.1).

[41] Bench Ruling at 9:16–20; A180 (Credit Agreement § 8.1(e)).

[42] Bench Ruling at 9:16–20.

[43] Bench Ruling at 9:21–10:2.

the RBI posted for feedback two proposed drafts that amended the Former ODI Regulations (the "Proposed ODI Regulations").[44] The Borrowing Exception was absent from the Proposed ODI Regulations.[45]

On February 11, 2022, DBS Bank, an authorized dealer on behalf of T&L, drafted an application seeking the RBI's approval for T&L and Whitehat to serve as guarantors.[46] While waiting for approval, on March 16, 2022, T&L failed to provide its third-quarter financial statements to Lenders pursuant to Section 5.1 of the Credit Agreement.[47] On March 29, 2022, T&L received approval from the RBI to serve as a guarantor, while Whitehat did not.[48] In response, the parties modified the contract around Whitehat's lack of approval. That same day, T&L circulated to Lenders, via GLAS, a proposed waiver (the "First Limited Waiver").[49] The Lenders agreed to the waiver and executed it on April 5, 2022.[50]

---

[44] A1369–70 (Expert Declaration of Mr. Atul Pandey Pursuant to 10 *Del. C.* 5356 ¶¶ 18–19 n.8–9, dated July 19, 2023).

[45] Bench Ruling at 10:9–12; Answering Br. at 12.

[46] A285–A301 (Draft letter from Byju's Alpha to DBS Bank with an Attached Application to RBI for Overseas Guarantee of Byju's Alpha by T&L and Whitehat, dated Feb. 11, 2022).

[47] Bench Ruling at 10:16–17; A148–A150 (Credit Agreement § 5.1); A598 (Verified Complaint ¶ 54).

[48] A325–A326 (RBI approval for T&L to Issue an Overseas Guarantee of $1.33B on behalf of Byju's Alpha, dated Mar. 29, 2022); A327–A329 (Memo to Bright Credit Lender Group from GLAS Informing Lenders that Despite Byju's Alpha Efforts, they have not Obtained RBI Approval, dated Mar. 29, 2022).

[49] *See* A330–A336 (Draft of First Limited Waiver of Credit Agreement, dated Mar. 29, 2022).

[50] Bench Ruling at 10:23–24; A356–A360 (First Limited Waiver, dated Apr. 5, 2022) [hereinafter "First Limited Waiver"].

The First Limited Waiver delayed the date for Whitehat to accede to the Credit Agreement as a guarantor to "October 8, 2022 and such later date as is agreed in writing by the [Required Lenders] . . . ."[51] Although Whitehat failed to accede to the Credit Agreement, the First Limited Waiver acknowledged that T&L had "used commercially reasonable efforts to obtain such RBI Approval on or prior to April 1, 2022," and had exerted "significant efforts (including but not limited to commercially reasonable efforts) . . . to obtain the RBI's approval on or prior to April 1, 2022 to permit Whitehat India to guarantee the Covered Obligations[.]"[52]

*F. The Second, Third, and Seventh Amendments*

The First Limited Waiver was not the end of the changes to the Credit Agreement. Before the new deadline of October 8, 2022, the RBI adopted new ODI regulations on August 22, 2022 that discontinued the Borrowing Exception (the "New ODI Regulations").[53] During this time, T&L failed, once again, to provide the required financial statements pursuant to Section 5.1. This included failing to provide the financial statements for its first fiscal quarter on August 14, 2022.[54] As of October 8, Whitehat still had not become a guarantor.[55] In response, on October 12, 2022, the parties executed the second

---

[51] A356 (First Limited Waiver at 1); Bench Ruling at 10:23–11:4.

[52] A356 (First Limited Waiver at 1).

[53] Bench Ruling at 11:5–8; A1317–A1318 (Andhyarujina Declaration ¶ 2 (xvii–xviii)).

[54] Bench Ruling at 11:9–11; A598–99 (Compl. ¶ 55–56).

[55] Bench Ruling at 11:14–16; A599 (Compl. ¶ 59).

amendment to the Credit Agreement (the "Second Amendment").[56] The date for Whitehat to accede to the Credit Agreement would be moved to November 24, 2022. The Second Amendment to the Credit Agreement amended Section 1.1 to include the following definition of "Specified Defaults":[57]

> "Specified Defaults" means any or all of the following:
>
> (a) the failure to deliver to [GLAS], as required under Section 5.1(a), the audited financials and other information for the fiscal year of the Parent Guarantor ended March 31, 2022.
>
> (b) the failure to deliver to [GLAS], as required under Section 5.1(b), the full and complete unaudited financials and other information (including the comparative figures for the relevant corresponding fiscal quarter in the relevant previous fiscal year) for each of the fiscal quarters of the Parent Guarantor ended December 31, 2021, and June 30, 2022; and/or
>
> (c) the failure of Whitehat India to accede to this Agreement and the Onshore Guarantee Deed as a Guarantor, as required under Section 5.9(c), and to otherwise comply with the other requirements under Section 5.9(c).[58]

The Second Amendment also amended Section 8.1(e) by providing that the Specified Defaults would have a 45-day cure period, expiring November 24, 2022, at which point any uncured Specified Default would mature into an Event of Default permitting GLAS to enforce remedies.[59]

---

[56] Bench Ruling at 11:17–18; B069–B119 (Amendment 2 to Credit Agreement, dated Oct. 12, 2022) [hereinafter "Second Amendment"].

[57] B069–B070 (Second Amendment).

[58] *Id.*

[59] Bench Ruling at 12:8–11; B070 (Second Amendment).

The first anniversary of the Credit Agreement, November 24, 2022, arrived and the Specified Defaults had not been cured.[60] This led to the creation of the third amendment (the "Third Amendment") in which T&L, along with the rest of the Guarantors and the Required Lenders, agreed not to deliver the Specified Notice of Acceleration before December 2, 2022.[61] However, the Third Amendment acknowledged that:

> [T]he Cure Period for each of the Specified Defaults referred to in the Amendment No. 2 will expire or has expired on November 24, 2022, without any of the Specified Defaults being cured by the Loan Parties, and (ii) the Required Lenders will be or are therefore entitled to, on and from November 25, 2022, request [GLAS] to deliver to the Loan Parties the Specified Notice of Default and Acceleration.[62]

Following more amendments, the Credit Agreement was amended for the seventh time on January 6, 2023 (the "Seventh Amendment").[63] The amendment acknowledged that the Cure Period had expired on November 24, 2022.[64] The only way to cure now was through a waiver by the Required Lenders. However, the Lenders agreed to delay GLAS's delivery of a default notice until at least February 10, 2023.[65] Three weeks later, on March 3, 2023,

---

[60] A604–A605 (Compl. ¶ 75).

[61] B120–B145 (Third Amendment to Credit Agreement, dated Nov. 24, 2022) [hereinafter "Third Amendment"].

[62] *Id.*; *see also* Bench Ruling at 12:12–22.

[63] Bench Ruling at 12:23–24; B146–B168 (Amendment 7 to Credit Agreement, dated Jan. 6, 2023) [hereinafter "Seventh Amendment"].

[64] B151 (Seventh Amendment § 3(a)(i)–(ii)).

[65] Bench Ruling at 13:3–5; B148 (Seventh Amendment "Forbearance Period"); B156 (Seventh Amendment "Forebearance").

the Required Lenders requested that GLAS deliver to T&L a default notice.[66]  That same day on March 3, 2023, GLAS delivered the notice to T&L.

G. *GLAS and Pohl's Actions After the Default Notice*

After the notice had been delivered, GLAS took a series of actions on behalf of the Lenders with the goal of obtaining control over Byju's Alpha.  GLAS started by exercising its rights under the Pledge Agreement and the Security Agreement to take control of Byju's Alpha's outstanding common stock.  GLAS transferred 1,000 common shares of Byju's Alpha – representing 100% of Byju's Alpha's equity – to GLAS's name.  In addition, GLAS executed "an Irrevocable Proxy memorializing its power to serve as [Byju's Alpha's parent company's] 'attorney-in-fact' and voted the pledged shares on [Byju's Alpha's parent company's behalf] . . . ."[67]

After GLAS believed that it had secured control over Byju's Alpha, GLAS and Pohl executed written consents to secure Pohl's position as sole director and officer of Byju's Alpha.  GLAS, in its capacity as sole stockholder, acted by written consent to amend the company's bylaws to grant its stockholders the power to fix the size of the company's board of directors.[68]  Then, GLAS in its capacity as sole stockholder, acted by written consent to give the company's stockholders the power to fill board vacancies by written consent.  GLAS again, as sole stockholder, acted by written consent to remove Ravindran as Byju's

---

[66] Bench Ruling at 13:6–9; B169–B196 (Credit and Guaranty Agreement, dated as of Nov. 24, 2021 (as amended from time to time) Direction to Deliver Notice of Events of Default and Acceleration; and Reservation of Rights, dated as of Mar. 3, 2023).

[67] A580 (Compl. ¶ 12).  The parent corporation being referred to is Byju's Pte.'s.

[68] Bench Ruling at 13:13–16.

Alpha's sole director. It also acted by written consent to appoint Pohl to fill the board vacancy. On March 3, after GLAS took the foregoing actions, Pohl acted by written consent, as Byju's Alpha's sole director, to remove all of the company's officers.[69] Two months later, on May 3, 2023, GLAS and Pohl filed a complaint in the Court of Chancery, pursuant to Section 225, seeking a declaration that their actions taken by written consent were valid.

### H. Proceedings in the Court of Chancery

#### 1. Pre-trial Motions and Proceedings

GLAS and Pohl filed a motion for expedited proceedings and for entry of a *status quo* order. After a telephonic hearing, the Court of Chancery, on May 18, 2023, granted the motion for expedited proceedings and a *status quo* order.[70] The *status quo* order provided that Pohl would continue to serve as sole officer and director of the Company.[71]

On May 30, 2023, Appellants filed their Answer to the Verified Complaint.[72] The following week on June 5, 2023, T&L and Tangible, along with other non-parties, filed a complaint in a New York state court against GLAS (the "New York Action").[73] They

---

[69] *Id.* at 13:17–24, 14:1–7.

[70] A1141–A1195 (Transcript of Telephonic oral Argument and Rulings of the Court on Plaintiffs' Motion for Expedition and Motion for *Status Quo* Order, dated May 18, 2023) [hereinafter "*Status Quo* Order"].

[71] A1186 (*Status Quo Order* at 46).

[72] *See* A1196–A1263 (Defendants' Answer to Verified Complaint Pursuant to 8 *Del. C.* § 225, dated May 30, 2023).

[73] *See* A1271–A1310 (Complaint filed in the New York Action, dated June 5, 2023) [hereinafter N.Y. Action].

sought a declaratory judgment that there was no event of default.[74]  They also alleged damages related to various breaches and interference with business relations.

## 2. Findings on Forum and Standing

The Court of Chancery held a trial on August 4, 2023 and delivered a thoughtful Bench Ruling in favor of GLAS and Pohl on November 2, 2023.  Pohl sought to validate six actions taken by himself and GLAS.[75]  However, acknowledging Section 225's summary nature, the trial court deemed five of the six within the scope of Section 225 but deemed GLAS's written consent amending Byju's Alpha's bylaws to be beyond the scope of the proceeding.  The trial court first held that Appellants' pre-trial brief did not adequately address the issue of whether non-signatory Pohl was bound by the forum selection clause of the Credit Agreement, and that the issue, therefore, had been waived.

## 3. Findings on the Whitehat Guarantee

The Court of Chancery considered the substantive challenges involving the Credit Agreement next.

### a. The Plain Language Interpretation of the Covenants

The Credit Agreement contains a New York choice-of-law provision.[76]  In keeping with this provision, the Vice Chancellor cited New York case law in interpreting the

---

[74] A1275 (N.Y. Action ¶ 8).

[75] Bench Ruling at 19:1–10.  *See also Genger v. TR Inv'rs, LLC,* 26 A.3d 180, 199 (Del. 2011) ("A Section 225 proceeding is summary in character, and its scope is limited to determining those issues that pertain to the validity of actions to elect or remove a director or officer.").

[76] *Id.* at 20:19–21; A207 (Credit Agreement § 10.9(a)).

agreement.[77]   The case law cited by the Vice Chancellor favored an interpretation of a contract that "does not render any part of the agreement superfluous or meaningless."[78] The court analyzed Article V of the Credit Agreement and focused on Section 5.9(c)'s plain language.   It concluded that Article V contained affirmative covenants that bind the loan parties.   To illustrate, Article V, entitled "Affirmative Covenants," and Section 5.9, together, state in relevant part:

> Until the Term Commitments have expired or been terminated and all Obligations . . . shall have been paid in full in cash, each Loan Party covenants and agrees with the lenders that:
>
> . . . .
>
> On and from the earlier of (i) April 1, 2022 and (ii) within five Business Days of the date RBI Approval is received, Whitehat . . . shall accede to this Agreement and the Onshore Guarantee Deed as a Guarantor[.][79]

The Vice Chancellor interpreted Section 5.9(c) to require Whitehat to accede as a guarantor on or before April 1, 2022.[80]   Further, the April 1 deadline was "a hard deadline" that was not conditioned on the receipt of RBI approval.[81]

The trial court agreed with Appellants that Section 5.9(c) is different from other covenants in the Credit Agreement because breach of that covenant is the result of a

---

[77] Bench Ruling at 20:21–21:9.

[78] Bench ruling at 20:21–21:4 (quoting *Greenfield v. Philles Records, Inc.*, 780 N.E.2d 166, 170 (N.Y. 2002)); *id.* at 21:4–21:9 (quoting *Brad H. v. City of New York*, 951 N.E.2d 743, 746 (N.Y. 2011)).

[79] A153 (Credit Agreement § 5.9(c)); Bench Ruling at 22:1–8.

[80] Bench Ruling at 21:13–22:11; A153 (Credit Agreement § 5.9(c)).   The Credit Agreement includes a New York choice of law provision.   Accordingly, the Court of Chancery interpreted it under New York law.   Bench Ruling at 20:19–21.

[81] Bench Ruling at 22:12–15.

nonparty's action or inaction.[82]  The trial court relied on the notion that a contract that is conditioned on events outside of one's control does not affect its validity or the consequences of its breach.  The Vice Chancellor found support for this position in Justice Holmes' *The Common Law*,[83] and Justice Souter's opinion in *United States v. Winstar Corp.*[84]  The Vice Chancellor relied upon the following reference by Justice Souter in *Winstar* to an illustration of this point by Justice Holmes:

> We read th[e] promise [at issue] as the law of contracts has always treated promises to provide something beyond the promisor's absolute control, that is, as a promise to insure the promisee against loss arising from the promised condition's nonoccurrence.  Holmes's example is famous: '[i]n the case of a binding promise that it shall rain tomorrow, the immediate legal effect of what the promisor does is, that he takes the risk of the event, within certain defined limits, as between himself and the promissee.'  Holmes, The Common Law (1881), in 3 The Collected of Justice Holmes 268 (S. Novick ed. 1995).  Contracts like this are especially appropriate in the world of regulated industries, where the risk that legal change will prevent the bargained-for performance is always lurking in the shadows.[85]

The Vice Chancellor found further support in Court of Chancery precedent that has applied this principle.  She cited to the Court of Chancery's decisions in *Symbiont.io, Inc. v. Ipero Holdings, LLC*,[86] and *Alliance Data Systems Corp. v. Blackstone Capital Partners V L.P.*[87]  The court in *Symbiont.io, Inc.* observed that "'[a] party can accept contractual

---

[82] *Id.* at 22:19–23:3.

[83] *Id.* at 23:4–24:1 (citing Oliver W. Holmes, Jr., *The Common Law* (1881), in 3 *The Collected Works of Justice Holmes* 268 (S. Novick ed. 1995)).

[84] *Id.* at 24:2–19 (citing 518 U.S. 839, 868–69 (1996)).

[85] *Winstar Corp.*, 518 U.S. at 868–69.

[86] 2021 WL 3575709 (Del. Ch. 2021).

[87] 963 A.2d 746 (Del. Ch. 2009), *aff'd* 976 A.2d 170, 2009 WL 1740171 (Del. June 18, 2009) (TABLE); *see also* Bench Ruling at 24:20–25:5.

consequences for events beyond its control, including the actions of entities that are not parties to the contract,' and that '[t]he insurance industry exists because of that basic proposition.'"[88] Even though these cases applied Delaware law, the court found them to be persuasive in interpreting the Credit Agreement under the lens of New York law.[89]

Next, the Court of Chancery determined that Section 5.17(d) and Section 5.9(c), did not conflict with each other but, instead, worked together.[90] It interpreted Section 5.17(d) to require T&L use reasonable commercial efforts to procure RBI approval *on or prior* to April 1, 2022.[91] The court held that Section 5.17(d) made clear that failure to do so would not require mandatory prepayment of the loan under the Credit Agreement.[92] By contrast, the court interpreted Section 5.9(c) to govern "only on April 1, or after RBI approval is obtained."[93] Moreover, the efforts clause "does not change, weaken, or nullify the fact that the loan parties covenanted that Whitehat would, in fact, accede and accept the consequences if it did not."[94] The Vice Chancellor turned to two sources to support this conclusion. The first was a treatise – *New York Contract Law* – which the Vice Chancellor quoted for the proposition that "[a] best efforts requirement should not be read as negating

---

[88] *Symbiont.io, Inc.*, 2021 WL 3575709, at *27 (citations omitted).

[89] Bench Ruling at 25:5–25:7.

[90] *Id.* at 25:12–14 ("Section 5.17(d) does not undermine my interpretation of Section 5.9(c), but rather works in tandem with it.").

[91] *Id.* at 25:12–21 (emphasis added).

[92] *Id.*

[93] *Id.* at 25:22–26:1.

[94] *Id.* at 26:2–8.

other clauses of the contract but should be reconciled with the other provisions."[95] The second source was *Vestron, Inc. v. National Geographic Society*, which states that a "best efforts requirement must be reconciled with other clauses in the contract to the extent possible, not used as a basis for negating them."[96]

The Court of Chancery highlighted other support that required Whitehat to accede under the Credit Agreement. For example, it pointed to the provision that "Whitehat's failure to accede to the onshore guarantee deal by April 1 will **not** give rise to a default if the guarantee maintenance amount is satisfied absent Whitehat's guarantee and other conditions are met."[97] The court reasoned that in order for the provision to have a purpose and not be superfluous, Whitehat's failure to accede must have created a default under the Credit Agreement.[98] Because Whitehat had not acceded, the loan parties were in breach of an Article V covenant, which could then mature into an event of default under Section 8.1(e).[99]

### b. Amendments and "Specified Default"

The court next determined that the Second, Third and Seventh Amendments reinforced that Whitehat's failure to obtain RBI approval was an event of default.[100] *First,*

---

[95] *Id.* at 26:9–14 (quoting NEW YORK CONTRACT LAW–NEW YORK PRACTICE SERIES § 28:15 (2d ed.)).

[96] *Id.* at 26:15–21 (quoting *Vestron, Inc. v. Nat'l Geographic Soc'y*, 750 F. Supp. 586, 593 (S.D.N.Y. 1990)).

[97] *Id.* at 27:1–7 (emphasis in original) (referring to Section 5.17(b)).

[98] *Id.* at 27:5–7.

[99] *Id.* at 27:8–18.

[100] *Id.* at 27:19–21; *id.* at 28:20–22; *id.* at 12:14–22.

the Second Amendment, executed on October 12, 2022, added Specified Defaults to Section 8.1(e).[101] That amendment gave T&L until November 24 to cure the Specified Defaults. Thus, the Second Amendment ensured that a failure to obtain the Whitehat guarantee would be an event of default.[102]

The Third Amendment's recitals acknowledged that T&L's failure to cure the Specified Defaults entitled the Required Lenders, on and from November 25, 2022, to request GLAS to deliver to the Loan Parties a default notice. The recitals also reflected the Required Lenders' agreement to refrain from requesting that GLAS deliver a default notice before December 2, 2022, notwithstanding the expiration of the cure period on November 24, 2022.[103]

*Third*, the Seventh Amendment, executed on January 6, 2023, likewise made clear that Whitehat's failure to accede was an event of default. It provided that the Specified Defaults could no longer be cured unless the Required Lenders consented. It stated in relevant part:

> It is hereby acknowledged and agreed by the parties hereto that:
>
> (i) the Cure Period for any Specified Defaults referred to in the Amendment No. 2 expired on November 24, 2022, without any of the Specified Defaults being cured by the Loan Parties; and
>
> (ii) none of the Specified Defaults as referred to in the Amendment No. 2 can be cured or remedied (or deemed to be cured or remedied) following the

---

[101] B069–070 (Second Amendment § 1(a)(c), (b)(c)).

[102] *Id.*; Bench Ruling at 27:19–28:19 ("What's more, the second amendment to the credit agreement ensured the failure to obtain the Whitehat guarantee was an event of default.").

[103] Bench Ruling at 12:14–22.

date of this Agreement other than by waiver by the Required Lenders in accordance with Section 10.2 of the Credit Agreement.[104]

The Vice Chancellor concluded that the Seventh Amendment was "a contractual stipulation that Whitehat's failure as a guarantor by November 24 to accede was an event of default."[105] The Vice Chancellor also held that the amendment's lack of curability and the reassertion of the right to send a default notice to Byju's Alpha supported her conclusion.[106]

Thus, the Vice Chancellor determined that Appellants' interpretation of the Credit Agreement covenants as exclusively requiring T&L use commercially reasonable efforts to procure RBI approval, was fatally flawed by "the credit agreement's plain language *and its subsequent amendments.*"[107] The trial court determined that GLAS's and Pohl's actions were valid, unless Appellants could successfully raise any potential defenses.[108]

### 4. Findings on the Defenses

#### a. Impossibility

The parties did not dispute that the New ODI Regulations had removed the Borrowing Exception which, in turn, made it impossible for Whitehat to obtain RBI approval. However, the parties disputed whether the risk of the ODI regulations changing

---

[104] B151 (Seventh Amendment § 3(a)(i)–(ii)); Bench Ruling at 28:20–29:10. The Required Lenders agreed that they would not request that GLAS deliver a default notice before February 10, 2023.

[105] *Id.* at 29:11-13.

[106] *Id.* at 29:11–20 ("[T]he amendment's discussion of the inability to cure or remedy the specified defaults necessarily requires that the specified defaults were events of default that could be cured.").

[107] *Id.* at 29:21–30:4 (emphasis added).

[108] *Id.* at 30:5–7.

was foreseeable.[109] The Vice Chancellor held that "[u]nder New York law, a party may be relieved of its obligation to perform where performance becomes objectively impossible."[110] The Vice Chancellor also noted that this defense is tightly constrained.[111] The court cited the standard set forth by the New York Court of Appeals in *Kel Kim Corp. v. Century Markets, Inc.*,[112] stating that "[i]mpossibility will relieve a party of its obligations only where, at the time of contracting, the risk at issue was both unforeseeable and unable to be guarded against in the contract."[113] The Vice Chancellor articulated three principles of contract law that she would apply in her analysis. *First*, the burden is on the defendant to demonstrate that performance is impossible.[114] *Second*, a change in law can render performance impossible.[115] *Third*, changes in law are generally foreseeable.[116]

---

[109] *Id.* at 31:9–16. The court determined that because Pohl did not argue against the New ODI Regulations making performance impossible, he thereby conceded the issue. *Id.* 31:9–12.

[110] *Id.* at 30:12-14.

[111] *Id.* at 30:15–21.

[112] 519 N.E.2d 295 (N.Y. 1987); *see also Gen. Elec. Co. v. Metals Res. Grp. Ltd.*, 741 N.Y.S.2d 218 (N.Y. App. Div. 2002); Bench Ruling at 30:12–31:3.

[113] Bench Ruling at 30:22–31:3 (citing *Kel Kim Corp.*, 519 N.E.2d 295, 296 (N.Y. 1987) (stating also that "[i]mpossibility excuses a party's performance only when the destruction of the subject matter of the contract or the means of performance makes performance objectively impossible.").

[114] Bench Ruling at 31:3–6 (citing *Red Tree Invs., LLC v. Petróleos de Venezuela, S.A.*, 2021 WL 6092462 (S.D.N.Y., 2021), *aff'd*, 82 F.4th 161 (2d Cir. 2023)).

[115] *Id.* at 31:6–7.

[116] *Id.* at 31:7–8 (citing WILLISTON ON CONTRACTS § 77:54 (4th ed.)). The precise language used by *Williston on Contracts* is "[r]ealistically, the fact that there will be changes in law, administrative rules, and regulations is generally foreseeable." WILLISTON ON CONTRACTS § 77:54 (4th ed.).

To determine foreseeability, the court examined the chronology of events, beginning with August 22, 2021 – months before the parties signed the Credit Agreement – when the Proposed ODI Regulations were posted for public comment.[117] The Proposed ODI Regulations were adopted a year later on August 22, 2022. The Borrowing Exception, which Whitehat relied upon, was absent in both the proposed and the subsequently enacted ODI regulations. Pohl's expert witness stated that it was reasonably foreseeable that the New ODI Regulations would not contain the Borrowing Exception because of its absence in the Proposed ODI Regulations.[118] By contrast, the court determined that Appellants' expert witness's opinion only supported the notion that the change was not *explicitly* noted in the Proposed ODI Regulations and that this lack of a specific mention did not render it unforeseeable.[119]

In determining that the change in regulations was foreseeable, the Vice Chancellor relied upon *Red Tree Investments, LLC v. Petróleos de Venezuela, S.A.*,[120] a decision applying a New York law. There, the United States District Court for the Southern District of New York considered an argument that an executive order imposing sanctions on certain Venezuelan-related entities, issued two weeks before the contracting parties entered into certain note and credit agreements, made a future expansion of the order foreseeable. Later, after the order was expanded to include state-owned businesses, defendants (who were

---

[117] Bench Ruling at 32:8–14.

[118] Bench Ruling at 32:21–33:1; A1383–84 (Expert Declaration of Mr. Atul Pandey Pursuant to 10 *Del. C.* 5356 ¶ 47, dated July 19, 2023).

[119] Bench Ruling at 32:21–33:12 (discussing A1328–A1329 (Andhyarujina Declaration ¶ 17)).

[120] Bench Ruling at 33:14–34:12 (citing *Red Tree Invs., LLC*, 2021 WL 6092462).

instrumentalities of the Venezuelan government) argued that the change in the law rendered their performance impossible.

The federal court explained that under New York law, "'[i]mpossibility excuses a party's performance only when the destruction of the subject matter of the contract or the means of performance makes performance objectively impossible.'"[121] Further, the impossibility must be the product of "'an unanticipated event that could not have been foreseen or guarded against in the contract[.]'"[122] It observed that New York's highest state court, the Court of Appeals, "has cautioned that the impossibility defense should be 'applied narrowly, due in part to judicial recognition that the purpose of contract law is to allocate the risks that might affect performance and that performance should be excused only in extreme circumstances.'"[123] The federal court held that because the expansion of the pre-existing Venezuelan sanctions to include a state-owned business and the risk-adverse reaction of some members of the banking community could have been foreseen and guarded against in the contract, defendants could not meet their burden of proof on the affirmative defense of impossibility.

---

[121] 2021 WL 6092462, at *4 (quoting *Kel Kim Corp. v. Cent. Mkts, Inc.*, 519 N.E.2d 295, 296 (N.Y. 1987)).

[122] *Id.* (quoting *Kel Kim Corp.*, 519 N.E.2d at 296).

[123] *Id.* (quoting *Kel Kim Corp.*, 519 N.E.2d at 296). The court also held that defendants had failed to provide sufficient evidence that payment was impossible. In affirming, the United States Court of Appeals for the Second Circuit upheld this aspect of the holding and concluded that it need not reach the alternative holding relating to the foreseeability of the sanctions. *See Red Tree Investments, LLC v. Petróleos de Venezuela, S.A.*, 82 F.4th 161, 170 (2d Cir. 2023).

Guided by this precedent, the Court of Chancery held that Appellants had failed to establish that the change in Indian regulations was unable to be guarded against.[124] In the court's view, the parties had expressly allocated the risk that RBI might not approve Whitehat by imposing the April 1 deadline. The parties provided that a default would occur if they failed to get RBI approval. The court weighed the fact that even after the New ODI Regulations were in place (*i.e.*, when the parties were aware that it would be impossible for Whitehat to receive approval from the RBI), the parties amended the contract but still did not move the risk away from the "loan parties."[125] Accordingly, the Vice Chancellor held that Appellants had failed to carry their burden in establishing an impossibility defense.

### b. Unclean Hands

In response to Appellants' unclean hands defense, the Court of Chancery questioned whether unclean hands, an equitable defense, was available in a Section 225 action as a defense to a legal claim. Regardless, the court reviewed the merits of the defense, ultimately rejecting it. *First*, the court determined that the case was not an "end-run" around New York's jurisdiction, as the court saw no evidence that the action under the Delaware General Corporation Law was filed "for any nefarious purpose."[126] *Second*, the willingness of the Lenders to patiently wait and forbear on the loans numerous times, even after they had become entitled to sending a default notice, cut against a finding of unclean

---

[124] Bench Ruling at 34:13–21; *see also id.* at 35:10–14.

[125] *Id.* at 34:22–35:9.

[126] *Id.* at 36:20–37:3.

hands. *Third*, the court rejected Appellants' argument that GLAS threatened to violate an NDA and release Byju's Alpha's confidential information. Specifically, the court determined that the evidence offered by Appellants, consisting of two emails and testimony, was not adequate to support Appellants' claims.[127] *Fourth*, the court held that Pohl did not violate the *status quo* order by entering into a director agreement with Byju's Alpha which provided a monthly salary of $75,000 for his services as sole director and officer.[128] This was because the director agreement was executed before entry of the *status quo* order. Therefore, Pohl, by accepting those payments, operated consistently with the *status quo* order.[129]

Accordingly, the court held that Pohl's and GLAS's actions were valid although it held the issue of GLAS's written consent determining the size of Byju's Alpha's board was outside the scope of the action. The Vice Chancellor then entered a final order and judgment on November 13, 2023, granting relief for Appellees.

## I. Contentions on Appeal

Following the Vice Chancellor's bench ruling, Appellants filed an appeal to this Court. They raise several contentions on appeal. *First*, they argue that the trial court erred by failing to address Appellants' arguments that the action below should have been dismissed in favor of the pending New York Action – aligning with the forum designated

---

[127] *Id.* at 38:1–39:5.

[128] *Id.* at 39:11–18. The court also determined that Pohl's compensation was not excessive. *Id.*

[129] *Id.* 40:2–41:3. The Vice Chancellor held that an affirmative defense of economic duress was waived. *Id.* at 39:24–40:1.

by the Credit Agreement's forum selection clause. They contend that the court erred in holding that Appellants waived an argument that Pohl was subject to that clause. *Second*, Appellants contend that the trial court erred in holding that the inability of T&L to procure RBI Approval for Whitehat's additional guarantee, notwithstanding its reasonable commercial efforts to procure such approval, constituted a breach of the Credit Agreement. *Third*, and finally, they maintain that the trial court erred in holding that the inability of T&L to procure RBI approval for Whitehat's additional guarantee was not excused on the grounds of legal impossibility.

## II. STANDARD OF REVIEW

"This Court reviews a trial court's finding of waiver under the standard of plain error."[130] "'In order for this Court to find plain error, the error complained of must be so clearly prejudicial to substantial rights as to jeopardize the fairness and integrity of the trial process.'"[131]

This Court "review[s] questions of contract interpretation *de novo*."[132] "This Court reviews the Court of Chancery's legal conclusions *de novo* but defers to the Court of Chancery's factual findings supported by the record."[133]

---

[130] *N. Am. Leasing, Inc. v. NASDA Holdings, LLC*, 276 A.3d 463, 470 (Del. 2022) (citing *Med. Ctr. of Del., Inc. v. Lougheed*, 661 A.2d 1055, 1060 (Del. 1995)).

[131] *Id.* (quoting *Med. Ctr. of Del., Inc.*, 661 A.2d at 1060).

[132] *Salamone v. Gorman*, 106 A.3d 354, 367 (Del. 2014).

[133] *Coster v. UIP Cos., Inc.*, 300 A.3d 656, 663 (Del. 2023) (citing *Backer v. Palisades Growth Cap. II, L.P.*, 246 A.3d 81, 94 (Del. 2021)).

## III.   ANALYSIS

### A. Whether Non-Signatory Pohl Was Bound by the Forum Selection Clause Was Not Fairly Presented in the Proceedings Below

We first address whether the Court of Chancery correctly held that Appellants waived their argument that the Credit Agreement's forum selection clause bound Pohl – a non-signatory of the Credit Agreement. Appellants contend that the trial court erred by not dismissing this action in favor of the New York action for two reasons: *First*, Appellants' forum selection clause arguments were fairly presented in the proceedings below; and *second*, the trial court failed to address any of Appellants' forum selection clause arguments in the Bench Ruling. The trial court summarily dispensed with this issue in the Bench Ruling as follows:

> This Section 225 action has two plaintiffs: Pohl, in his capacity as a purported director and officer of BYJU's Alpha, and GLAS as BYJU's Alpha's sole stockholder. Defendants challenge GLAS's ability to bring this claim in this Court under the credit agreement's forum selection clause.
>
> But I need not resolve the forum selection issue pertaining to GLAS. Defendants have made no argument that Pohl is bound by the forum selection clause. He is a non-signatory, and defendants' pretrial brief did not address whether Pohl is bound by the credit agreement's forum selection clause as such.
>
> *Any such argument is therefore waived, and I conclude the forum selection clause does not bind Pohl.* And as I will explain, Pohl has standing to bring this action. If Pohl can bring this action, then this Court's judgment in rem will establish the status of BYJU's Alpha's director and officer seats to the exact same extent as if GLAS had brought it. I will consider the claim as presented by Pohl.[134]

---

[134] Bench Ruling at 15:19–16:15 (emphasis added).

Thus, according to the trial court, Appellants' failure to specifically argue that Pohl was bound by the forum selection clause was dispositive.

"Under Supreme Court Rule 8 and general appellate practice, this Court may not consider questions on appeal unless they were first fairly presented to the trial court for consideration."[135] A "very narrow" exception to Rule 8 allows this Court to consider a "question for the first time on appeal 'when the interests of justice so require.'"[136] However, this exception is "extremely limited" and invokes the plain error standard of review.[137] Under that standard, if the error in question is "'so clearly prejudicial to substantial rights as to jeopardize the fairness and integrity of the trial process,' then we may consider that appellant's argument even though he did not fairly present the argument to the trial court for decision."[138] Here, the circumstances do not meet the high threshold of the Rule 8 exception under the plain error standard of review. Accordingly, we affirm the trial court's finding of waiver.

At oral argument, Appellants' counsel stated that the "trial record" was the best record evidence that this issue was not waived.[139] A closer review of the trial record,

---

[135] *Russell v. State*, 5 A.3d 622, 627 (Del. 2010) (citing Del. Supr. Ct. R. 8; *Wainwright v. State*, 504 A.2d 1096, 1100 (Del. 1986)).

[136] *Id.* (quoting Del. Supr. Ct. R. 8).

[137] *Id.* (citing *Wainwright*, 504 A.2d at 1100).

[138] *Id.* (quoting *Wainwright*, 504 A.2d at 1100); *see also Med. Ctr. of Del., Inc. v. Lougheed*, 661 A.2d 1055, 1060 (Del. 1995).

[139] In asserting that the trial record was the best record evidence that this issue was not waived, Appellants' counsel conceded at oral argument that the briefing was "less strong" evidence:

however, does not support Appellants' contention because at no point in the proceedings below did Appellants' counsel explicitly argue that Pohl was bound by the forum selection clause because he was a non-signatory. At the trial, Appellees' counsel and the trial court engaged in a lengthy discussion concerning whether Pohl brought this suit in his individual capacity or in his capacity as the director of Byju's Alpha.[140] In response to this discussion,

---

> **The Court**: What would you consider is your best record evidence that this was not waived. I know you have different things in here, but what do you consider your strongest evidence that it was it not [waived]?
>
> **Appellants' Counsel**: I think the trial record. There is probably, I want to estimate, 10 to 12, maybe 8 to 12, pages of back and forth from the court. I think the test is really was it fairly presented? I think the proof is in the pudding [because] the other side addressed the issue and so it was not a surprise to them. It was before the court knew the issue and the court had a discourse about the issue, but I would say the trial record admittedly is the strongest. The briefing is less strong.

Oral Argument, at 7:58–8:37, https://vimeo.com/982096660.

[140] Section 225 Trial Tr. 64:9-72:14. The following exchange, which was highlighted in Appellants' opening brief demonstrates that Defendants, at trial, generally argued that Pohl brought this suit not in his individual capacity, but rather in his capacity as the director of Byju's Alpha. Absent from this exchange is any explicit argument addressing whether Pohl was bound by the forum selection clause despite being a non-signatory:

> **Defendants' Counsel:** Mr. Pohl is only here because he claims to be a sole director and officer of Byju's Alpha. He says so in paragraph 1 of the verified complaint. His sole basis for acting is based on the validity of the enforcement action, and that's an issue to be determined in New York. He is here as an agent of a party to the credit agreement, a party that's bound by the exclusive jurisdiction clause.
>
> **Court of Chancery:** Can you address the argument that a 225 and the ability to bring a 225 is bestowed on stockholders and directors, it's not bestowed on the company.
>
> **Defendants' Counsel:** Well, it's bestowed on stockholders and directors, but he's only a director of the company by virtue of him exercising the pledge; otherwise, he's just a private citizen. Either way, he's there through the mechanics of the credit agreement and the forum selection clause, which said all of the parties, each of the parties, agree to the exclusive jurisdiction. Also, he's not really a necessary party to this proceeding. They didn't really need to add him. This could have been brought by GLAS alone. And the fact that they added him, I suspect, is so that they can make this argument. But he's really not a necessary party here.

31

Appellants' attorney stated that he would be "happy be to address [that issue], but I think you're already there, which is exactly right."[141] This cursory comment does not register as an argument that is fairly presented to the trial court for consideration as required by Rule 8.[142]

Beyond the trial record, little exists from the briefing or the *status quo* hearing that supports Appellants' contention that this issue was not waived. Appellants' brief in opposition to Appellees' motion for a *status quo* order did not address this specific issue. Rather, it focused on the general application of the forum selection clause, not whether non-signatory Pohl was expressly bound by it.[143] At the subsequent *status quo* hearing, the only mention of Pohl in the context of this argument was by Pohl's attorney.[144] Appellants' attorney, by contrast, merely repeated the general application of the forum selection clause arguments that were asserted in the pre-hearing brief and did not specifically address whether Pohl was bound by it.[145] Turning to Appellants' answer to the verified complaint, their second affirmative defense addressed only whether the forum selection clause encompassed the claims in the case, not whether Pohl was bound by it: "[t]he Complaint

---

Section 225 Trial Tr. at 90:4–91:5.

[141] *Id.* at 90:1–3.

[142] Del. Supr. Ct. R. 8.

[143] A658–A659 (Defendants' Answering Brief in Opposition to Plaintiffs' Motion for *Status Quo* and Opening Brief in Support of Motion to Seal the Courtroom, dated May 15, 2023) ("As noted above, Section 10.9(c) of the Credit Agreement contains a clear and explicit provision selecting New York as the exclusive forum for actions relating to the Credit Agreement.").

[144] *See* A1159–A1160 (*Status Quo* Order at 19–20) ("Also, the forum provision doesn't apply to Mr. Pohl, who is not a signatory to the credit agreement.").

[145] *See* A1175–A1176 (*Status Quo* Order at 35–36); *see also* A1187 (*Status Quo* Order at 47).

should be dismissed for lack of jurisdiction pursuant to the exclusive New York forum selection clause contained in the Credit Agreement."[146]

The joint pre-trial order again emphasized that the forum selection clause governed the claims arising from the Credit Agreement, not whether Pohl was specifically bound by it: "Plaintiffs commenced this action on May 3, 2023 even though the Credit Agreement contains an exclusive New York forum selection clause. *New York is the only jurisdiction in which the totality of the parties' dispute concerning these events, as well as their full legal consequences, can be determined*."[147] Although Appellants point to a footnote in their Pre-Trial brief, this footnote is insufficient. It merely states that "Pohl (who has brought the instant suit in his putative capacity as 'sole director' of Byju's Alpha) is neither an Agent nor a Lender."[148] This point does not address the contention that the forum provision does not apply because Pohl is a non-signatory. Rather, it appears to be addressed to the last sentence of the forum selection clause which allows any "Agent" or "Lender" to "bring any action or proceeding relating to this Agreement . . . in the courts of any jurisdiction[.]"[149]

Appellants' citation to various examples from the proceedings below where Pohl's counsel suggested that he was not bound by the forum selection provision does not help

---

[146] A1261 (Defendants' Answer to Verified Complaint Pursuant to 8 *Del. C.* § 225, dated May 30, 2023).

[147] A1532 (Pre-Trial Stipulation at 5) (emphasis added).

[148] A1510 (Defendants' Pre-Trial Brief dated July 21, 2023 at 38, n.16).

[149] A208; A1510.

them either.[150]  They suggest, by these examples, that Pohl's counsel had sufficient notice of this argument and could not have been surprised.  Yet despite Pohl's counsel raising the argument, Appellants' counsel never squarely responded to it.

Appellants' argument concerning the lack of post-trial briefing fares little better. Although the trial court did not request any post-trial briefing,[151] this does not absolve Defendants from failing to make this specific argument during trial or in their pre-trial briefing.  Defendants knew before the trial that there was no post-trial briefing unless

---

[150] *See generally* A1133 (Plaintiffs' Reply Brief in Further Support of Motion for Expedited Proceedings and for *Status Quo* Order, dated May 17, 2023) ("[T]his litigation will still move forward in Delaware on the merits.  This is because neither the current nor former directors and officers of BYJU's Alpha — Pohl and Ravindran, respectively — are parties to the Credit Agreement, and accordingly, they are not bound by its venue selection clause."); A1159 (*Status Quo* Order at 19) ("Also, the forum provision doesn't apply to Mr. Pohl, who is not a signatory to the credit agreement."); A1458 (Plaintiffs' Pre-Trial Brief, dated July 21, 2023) ("But the forum provision does not require GLAS to sue in New York and additionally is inapplicable to Pohl, who is not a party to the Credit Agreement."); A1461 (Plaintiffs' Pre-Trial Brief, dated July 21, 2023) ("Alternatively, Pohl as the person asserting a claim to office, is neither a party to the Credit Agreement nor 'closely related' to the parties thereto — and, in particular, was not involved in the negotiation of the Credit Agreement.  As such, Pohl is not bound by the contract's forum provision."); A1650–A1657 (Section 225 Trial Tr. at 63–70).

[151] *See* A1270 (Stipulation and Order Governing Case Schedule, dated May 30, 2023) ("There will be no post-trial briefing and/or argument, unless requested by the Court after trial has concluded.").

requested by the court.[152]  Therefore, they should have adequately raised this issue before the trial's conclusion.[153]

Appellants lean heavily on the unfair surprise rationale for waiver rules but neglect the other policies behind waiver – namely, judicial economy and the value of finality.  Even if we assume Appellees were not unfairly surprised by the forum selection issue, Appellants' failure to join the issue prevented the issue from being determined by the trial court.  Appellees and the trial court took the time, effort, and expense to litigate this case through extensive briefing and a trial.  We find it difficult to see how judicial economy and finality can square with requiring the parties to retry the case, merely because Appellants failed to address an issue which they now claim is vital to this case.  The narrow exception to Rule 8 allows this Court to consider a "question for the first time on appeal 'when the interests of justice so require.'"[154]  After examining the record, we cannot conclude that this threshold has been met.

---

[152] This fact was highlighted at oral argument:

> **The Court:**  Did the parties know going into trial that there would not be post-trial briefing?
>
> **Appellants' Counsel:** I believe we did.  I think that was in the pre-trial order that the court had added to . . . the "so ordered" line of the pre-trial order.  That is correct your Honor.

Oral Argument, at 6:45–7:04, https://vimeo.com/982096660.

[153] *See, e.g., Biolase, Inc. v. Oracle Partners, L.P.*, 97 A.3d 1029, 1036 (Del. 2014) ("The parties filed pre-trial briefs and the Court of Chancery held both a trial and post-trial argument in this case. [Cross-appellant] did not take advantage of any of these opportunities to fairly present an argument in support of its request for an award of attorneys' fees . . . .  Thus, the Court of Chancery did not abuse its discretion when it entered a final judgment that denied [cross-appellant]'s claim for attorneys' fees.").

[154] *Russell v. State*, 5 A.3d 622, 627 (Del. 2010) (quoting Del. Supr. Ct. R. 8).

*B. The Amendments Demonstrate That Defendants Breached the Credit Agreement*

The next issue we address is whether the trial court properly concluded that Whitehat's failure to accede as a guarantor constituted a breach of the Credit Agreement, thereby allowing the Lenders to seek remedies. Appellants make three main arguments concerning this issue. *First*, Section 5.9(c), by its own language, does not obligate the Loan Parties to obtain the accession of Whitehat; *second*, the trial court misconstrued the relationship between Sections 5.9(c) and 5.17 – rendering the latter meaningless; and *third* any breach was "trivial" in nature and the enforcement of remedies would be "unconscionable." We need not address these arguments, however, because the Second, Third, and Seventh Amendments to the Credit Agreement foreclose Appellants' other substantive arguments.

Read together, the Second, Third, and Seventh Amendments to the Credit Agreement make clear that Appellants voluntarily conceded that Whitehat's failure to accede as a guarantor was an explicit breach of the Credit Agreement, thus entitling GLAS to enforce its remedies. In the Second Amendment, the parties defined "Specified Defaults" to include "the failure of Whitehat India to accede to this Agreement and the Onshore Guarantee Deed as a Guarantor, as required under Section 5.9(c), and to otherwise comply with the other requirements under Section 5.9(c)."[155] In the Third Amendment, the parties acknowledged the following:

> It is hereby acknowledged and agreed by the parties hereto that (i) the Cure Period for each of the Specified Defaults referred to in the Amendment No. 2 will expire or has expired on November 24, 2022, without any of the

---

[155] B070 (Second Amendment § 1(a)(c)).

Specified Defaults being cured by the Loan parties, and (ii) the Required Lenders will be or are therefore entitled to, on an from November 25, 2022, request the Administrative Agent to deliver to the Loan Parties the Specified Notice of Default and Acceleration.[156]

Thus, the Third Amendment explicitly noted that Whitehat's failure to accede to the Credit Agreement as a guarantor had not been cured. It emphasized further that the Lenders were entitled to exercise remedies through a notice of default and acceleration with respect to that default.

Turning to the Seventh Amendment, we agree with the trial court's conclusion that the Seventh Amendment was a "contractual stipulation that Whitehat's failure to accede as a guarantor by November 24 was an event of default."[157] The operative language of the Seventh Amendment makes this point clear:

(a) It is hereby acknowledged and agreed by the parties hereto that:

(i) the Cure Period for any Specified Defaults referred to in the Amendment No. 2 expired on November 24, 2022, without any of the Specified Defaults being cured by the Loan Parties; and

(ii) notwithstanding any actions or otherwise by the Parent Guarantor or any other Person following the date of this Agreement (including, without limitation, the delivery to the Administrative Agent of any relevant financial information or statements the subject of any Specified Default), none of the Specified Defaults as referred to in the Amendment No. 2 can be cured or remedied (or deemed to be cured or remedied) following the date of this Agreement other than by waiver by the Required Lenders in accordance with Section 10.2 of the Credit Agreement.[158]

---

[156] B121 (Third Amendment, § 1(a)).

[157] Bench Ruling at 29:11–13.

[158] B151 (Seventh Amendment, § 3 (a)(i) & (ii)).

The Seventh Amendment's discussion of the inability to cure, other than by waiver by the Required Lenders, necessarily suggests that the Specified Defaults were events of default that could be cured. We agree with the trial court that the plain language of the Second, Third, and Seventh Amendments to the Credit Agreement shows that Whitehat's failure to accede as a guarantor constituted an event of default which entitled GLAS to send a default notice and seek remedies.

Appellants' arguments to the contrary fall short. Appellants' main response, contained in their reply brief, is that Appellants never conceded that Whitehat's non-accession constituted a "material breach" of the Credit Agreement.[159] This argument is a stretch.[160] The amendments explicitly define Whitehat's failure to accede as a "Specified

---

[159] *See* Reply Br. 16–17.

[160] The following exchange from oral argument highlights Appellants' tenuous claim:

> **The Court**: Do we even need to go through that analysis in view of the Second, Third, and Seventh Amendments which make it pretty clear there is an event of default.

> **Appellants' Counsel**: It is a good question your Honor. In those amendments, I think it is Amendment 2 has the defined term "Specified Defaults." That is a defined term. I think . . . .

> **The Court**: Which includes the Whitehat accession?

> **Appellants' Counsel**: It includes Whitehat accession. It does not state that it is a material breach. It says it is a "Specific Default" and that they could send notice.

> **The Court**: Is that your only argument because it seems like a tough argument to make when the parties go through at least three of these amendments that deal expressly with the Whitehat accession and say it is a "Specified Default" entitling the Lenders issue a notice of [acceleration of default].

> **Appellants' Counsel**: Yeah, it is a tough provision to deal with. But I would say that the Lenders' counsel knew how to draft this more precisely to state that this was a material breach, and you had no defenses to it. That was not done. It is a Specified Default for purposes of the lender is not waving their rights to send out

Default."[161]   Moreover, the amendments specify what will happen in the event of a Specified Default.  Thus, although the amendments do not include the word "material," the amendments still specify that GLAS is entitled to exercise its remedies.

Nor is this a situation where a sophisticated party tricked an unsophisticated party with fine print and legal jargon.  The amendments were contracts extensively negotiated by sophisticated, well-counseled parties and the several rounds of amendments demonstrate an obvious, deliberate effort by the parties to address this specific issue.  Accordingly, the parties are bound by the terms of the Credit Agreement.  For these reasons, we need not address Appellants' other substantive arguments because they are foreclosed by the explicit language of the Second, Third, and Seventh Amendments to the Credit Agreement.

---

notice.  They were extending, clearly from a practical standpoint.  They were trying to . . . keep this loan on the books and functioning but . . . .

**The Court**:  But the use of the word "material" is not in here.  I mean it says that, the Seventh Amendment, for example, none of the Specified Defaults [] referred to in amendment number two can cured or remedied following the date of this agreement other than by waiver by the Required Lenders.  I mean that is pretty cut and dry, isn't it?

**Appellants' Counsel**:  The language appears to be cut and dry.  I think under New York's law about trivial breaches, I think there is an argument that could made to the New York courts that deal with these agreements stating that "that's great, it can't be waived.  But was it really material which is a requirement.  Is it trivial is it non-monetary?"  The court would have to deal with that, but this is a 225 case that . . . was rapid and narrowly tailored to a corporate dispute, not this large credit agreement dispute that was supposed to be in New York as we argue.

Oral Argument, at 13:53 –16:23, https://vimeo.com/982096660.

[161] B070 (Second Amendment § 1(a)(c)).

*C. Appellants' Impossibility Defense is Unavailing*

The final issue we address is Appellants' contention that the trial court erred in holding that the inability of T&L to procure RBI approval for Whitehat's additional guarantee was not excused by the grounds of legal impossibility. We agree with the trial court's analysis and conclusion.

To resolve this issue, we borrow from the trial court's cogent analysis of New York contract law. New York, like Delaware,[162] recognizes the defense of impossibility. Under certain circumstances, a party can be freed of its contractual obligations when performance is rendered impossible. However, as demonstrated by the case law cited by the trial court, this defense is tightly constrained as "[w]hile such defenses may have been recognized in the common law, they have been applied narrowly, due in part to judicial recognition that the purpose of contract law is to allocate the risks that might affect performance and that *performance should be excused only in extreme circumstances*."[163] In light of this narrow application, "[i]mpossibility excuses a party's performance only when the destruction of the subject matter of the contract or the means of performance makes performance

---

[162] *See Bobcat N. Am., LLC v. Inland Waste Holdings, LLC*, 2019 WL 1877400, at *9 (Del. Super. 2019) ("Under Delaware law, an impracticability/impossibility defense requires the showing of '(1) the occurrence of an event, the nonoccurrence of which was a basic assumption of the contract; (2) the continued performance is not commercially practicable; and (3) the party claiming impracticability did not expressly or impliedly agree to performance in spite of impracticability that would otherwise justify nonperformance.'") (quoting *Chase Manhattan Bank v. Iridium Afr. Corp.*, 474 F. Supp.2d 613, 620 (D. Del. 2007)).

[163] *Kel Kim Corp. v. Cen. Mkts, Inc.*, 519 N.E.2d 295, 296 (N.Y. 1987) (emphasis added).

objectively impossible. Moreover, the impossibility must be produced by *an unanticipated event that could not have been foreseen or guarded against* in the contract."[164]

The trial court noted two other aspects of the impossibility defense that bear repeating. *First*, the burden is on the party that invokes the affirmative defense of impossibility to demonstrate that performance is impossible.[165] *Second*, although a change in law can render performance impossible, "[w]hen a change of law is reasonably foreseeable at the time a contract is entered into, impossibility of performance is no defense."[166]

We find it difficult to see the changes to the ODI regulations as being unforeseeable under this legal framework given the sequence of events surrounding the execution of the Credit Agreement and the changes to the ODI regulations. The Credit Agreement was executed on November 24, 2021, when the RBI operated under the Former ODI Regulations.[167] Because the Former ODI Regulations allowed a subsidiary to rely on, and in effect "borrow" from, its parent entity's net worth to satisfy the Net Worth Test via the Borrowing Exception, the Former ODI Regulations allowed Whitehat to satisfy the Net Worth Test.[168] However, three months before the execution of the Credit Agreement, the

---

[164] *Id.* (emphasis added).

[165] *Red Tree Invs., LLC v. Petróleos de Venezuela, S.A.*, 2021 WL 6092462, at *5 (S.D.N.Y., 2021), *aff'd*, 82 F.4th 161 (2d Cir. 2023)).

[166] WILLISTON ON CONTRACTS § 77:54 (4th ed.) ("Realistically, the fact that there will be changes in law, administrative rules, and regulations is generally foreseeable.").

[167] Bench Ruling at 6:2–4; A1314–15 (Andhyarujina Declaration ¶ 3 (viii)).

[168] Bench Ruling at 6:12–15; A1315 (Andhyarujina Declaration ¶ 3 (x)).

RBI, on August 9, 2021, publicly published the Proposed ODI Regulations.[169]  The Borrowing Exception was notably absent from the Proposed ODI Regulations.[170]  The RBI then adopted the New ODI Regulations on August 22, 2022 – after the execution of the Credit Agreement.[171]  Consistent with the Proposed ODI Regulations, the New ODI Regulations discontinued the Borrowing Exception.[172]

Given this sequence of events, it was foreseeable at the time of executing the Credit Agreement that the RBI might eliminate the Borrowing Exception because the RBI had already omitted it from the publicly available Proposed ODI Regulations.  As these Proposed ODI Regulations were released three months prior to the execution of the Credit Agreement, we struggle to believe that the sophisticated, well-counseled parties for this billion-dollar transaction could not have foreseen the elimination of the Borrowing Exception.  In other words, the removal of the Borrowing Exception was not an unforeseeable, "unanticipated event that could not have been foreseen or guarded against in the contract."[173]

The declaration from GLAS and Pohl's Indian law expert further supports our view.  The expert stated that the Proposed ODI Regulations' omission of the Borrowing Exception would have been understood to mean that the Borrowing Exception would be no longer

---

[169] A1369–70 (Expert Declaration of Mr. Atul Pandey Pursuant to 10 *Del. C.* 5356 ¶¶ 18–19 n.8–9, dated July 19, 2023).

[170] Bench Ruling at 10:9–12.

[171] Bench Ruling at 11:5–8; A1317–A1318 (Andhyarujina Declaration ¶ 2 (xvii–xviii)).

[172] Bench Ruling at 11:5–8; A1317–A1318 (Andhyarujina Declaration ¶ 2 (xvii–xviii)).

[173] *Kel Kim Corp. v. Cen. Mkts, Inc.*, 519 N.E.2d 295, 296 (N.Y. 1987).

recognized.[174] We are not convinced by Appellants' expert's contrary view that the change was not foreseeable because the removal of the Borrowing Exception was not "apparent" from the Proposed ODI Regulations because the regulations did not "expressly state" the change.[175] Rather, we agree with the trial court's conclusion that "[s]howing that a change in law was not explicit does not show that it was not foreseeable. The change in law need not be explicitly spelled out to be foreseeable."[176]

The context of *Red Tree* is analogous to the situation in this case and supports the holding here. In *Red Tree*, which is summarized earlier, the court rejected an impossibility defense where an executive order sanctioned certain Venezuelan persons and entities several weeks before the parties reached the agreement in dispute.[177] The court determined that a future expansion of those sanctions was foreseeable and that the defendants had failed to "guard[] against the contingency of expansion of sanctions."[178] As a result, the *Red Tree* defendants failed to meet the burden of proof on the affirmative defense of impossibility.[179]

---

[174] A1383–84 (Expert Declaration of Mr. Atul Pandey Pursuant to 10 *Del. C.* 5356 ¶ 47, dated July 19, 2023).

[175] A1328–A1329 (Andhyarujina Declaration ¶ 17).

[176] Bench Ruling at 33:11–14.

[177] *Red Tree Invs., LLC v. Petróleos de Venezuela, S.A.*, 2021 WL 6092462, at *6 (S.D.N.Y., 2021), *aff'd*, 82 F.4th 161 (2d Cir. 2023)).

[178] *Id.*

[179] *Id.* at *7 ("Because the expansion of the pre-existing Venezuelan sanctions to include a state-owned business and the risk-adverse reaction of some members of the banking community could have been foreseen and guarded against in the contract, defendants cannot meet its burden of proof on the affirmative defense of impossibility.").

Appellants' argument that *Red Tree* is distinguishable because performance in *Red Tree* was difficult, but not impossible, falls flat. The *Red Tree* court mentioned this as one rationale, but the court also held that "[a]s alternative grounds for granting summary judgment against PDVSA, the Court concludes that defendants have failed to demonstrate that the sanctions were not reasonable foreseeable."[180] Appellants' second argument that the Credit Agreement's silence on the issues distinguishes the present case from *Red Tree* also comes up short. Although the *Red Tree* court acknowledged that the agreement in that case expressly contemplated the sanctions that rendered performance impossible, the holding did not turn on that point. Rather, the court held that the impossibility defense failed because the impossibility "could have been foreseen and guarded against in the contract[.]"[181]

Here, we hold that the elimination of the borrowing exception "could have been foreseen and guarded against."[182] Although no official law or executive order was promulgated by the Indian government, the RBI publicly signaled its intention to remove the Borrowing Exception when it published the Proposed ODI Regulations. Accordingly, because the sophisticated, well-counseled parties in this case failed to guard against the very real possibility of the Borrowing Exception's removal, Appellants did not meet their burden of proof on the affirmative defense of impossibility.[183]

---

[180] *Id.* at *6.

[181] *Id.* at *7.

[182] *Id.*

[183] Appellants' citation to *Campo v. Board of Education, Brookhaven-Comsewogue Union Free School District*, does not persuade us otherwise. 622 N.Y.S.2d 66 (N.Y. App. Div. 1995).

To summarize: (i) we need not decide whether non-signatory Pohl is bound by the forum selection clause because this issue was not fairly presented below; (ii) Appellees were entitled to exercise the default remedies because Appellants conceded the breach of the Credit Agreement in the Second, Third, and Seventh Amendments entitling GLAS to enforce its remedies; and (iii) the defense of impossibility is inapplicable because the change in the ODI regulations was reasonably foreseeable.[184]

## IV.    CONCLUSION

For the reasons set forth above, we AFFIRM the Court of Chancery's opinion.

---

Appellants highlight language from *Campo* stating that "[w]hen a municipality takes action, after the signing of the contract, which makes the bargain impossible, it would be inequitable to require performance[.]" *Campo*, 622 N.Y.S.2d at 67.  However, the context of *Campo* is significantly different from this case because there, a municipality changed a property's zoning classification unexpectedly and without warning after a land sale contract had been signed.

[184] The Court of Chancery, having ruled on the consequences of the Whitehat guarantee default, did not address the alleged reporting defaults.  *See* Bench Ruling at 17:8–11.  Nor do we.